## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### F. STRAUSS AND SON, INC., Respondent.

No. 75–2763.

United States Court of Appeals, Fifth Circuit.

July 29, 1976.

Elliott Moore, Deputy Assoc. Gen. Counsel, William Wachter, Julius Rosenbaum, N.L.R.B., Washington, D.C., Chas. M. Paschal, Jr., Director, Region 15, N.L.R.B., New Orleans, La., for petitioner.

Andrew C. Partee, Jr., New Orleans, La., for respondent.

Before GEWIN, COLEMAN and GOLD-BERG, Circuit Judges.

GEWIN, Circuit Judge:

This case is before the court pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, upon application of the National Labor Relations Board for enforcement of its order. The Board found that respondent F. Strauss and Son, Inc. (Company) had violated § 8(a)(1) and (5) of the Act by insisting that any contract executed with the certified bargaining representative, the Retail Clerks International Association, Local 210, AFL–CIO (Union) have a duration limited to the nine days remaining in the certification year. The Board's order, in addition to the customary cease and desist provisions, requires the Company to bargain collectively with the Union upon request and to execute any agreement reached. The Board's decision and order are reported at 216 NLRB No. 18. We enforce.

On December 8, 1972 the Board certified the Union as the exclusive collective bargaining representative of the unit employees at the Company's plant in Monroe, Louisiana. In January of 1973, collective bargaining began and continued for nineteen meetings. By June 7, 1973 the parties had reached agreement on all issues except a significant wage matter and union security; they had agreed to a contract term of three years. When the Company rejected the Union's counterproposals on the two disputed issues, the unit employees voted to strike. The strike commenced on August 22, 1973.

The strike did not succeed in bringing about an interruption in Company business. By bringing in supervisory personnel from other plants and hiring replacements for the strikers, the Company was able to continue to operate its Monroe plant during the strike. After commencement of the strike on August 22, no bargaining sessions were held until a November 20 meeting requested by union representatives. At this meeting, union representatives asked Company representatives whether the Company's proposals of June 7 had been changed in any way. They were told that the June 7 package remained on the table. The Union submitted certain new counterproposals, which the Company agreed to consider. The Company indicated that it wanted the strikers to return to work in the event of settlement. After the November 20 meeting, union representatives agreed among themselves to accept the Company's entire June 7 package if their latest counterproposals were rejected by the Company. Another meeting was scheduled for November 29.

On November 22 employee Dan Pierria advised the Company president, Thomas Mulhearn, that he was tired of the Union and asked how to get rid of it. Mulhearn told Pierria to contact the Board. On November 26 Pierria again visited president Mulhearn; he said that he had mailed a "petition" to the Board with the names of seventy-one employees, a majority of the union members still working. Mulhearn related this development to Frederick Kullman, the Company's principal negotiator, who contacted the Board's Regional Office in New Orleans. The Board told Kullman that a "communication" had been received from the Company employees, but that no decertification petition had been filed. The Regional Office did not show Kullman the list or give him either the names or the number of names appearing thereon.[1]

---

1. The document, which Company officials never saw, bore the following caption: "We the voting unit of F. Strauss and Son no longer wish to have the Retail Clerks Union represent us, and we strongly petition the N.L.R. Board to call for another election."

This document failed on its face to meet the requirements for a valid decertification petition. *See* 29 C.F.R. § 102.61. In addition, it was prematurely filed. *See NLRB v. Holmes Tuttle Broadway Ford, Inc.,* 465 F.2d 717, 719 (9th Cir. 1972). Consequently, the Board prop-

At the November 29 bargaining session Kullman advised the union representatives that seventy-one employees had signed a document indicating their desire to withdraw from the Union. He stated that this list of names had been forwarded to the Board's Regional Office in New Orleans. "Based on this, and the turnover . . .," he said, "we feel we have the right to question your certification." He went on to assert that at the end of the certification year if the employees did not file a decertification petition, the Company would. Finally, Kullman said, "Based on these circumstances we cannot offer you a contract except to the end of the certification year." The certification year was to expire in nine days.

The union representatives then left the meeting to caucus among themselves. When they returned, a union spokesman stated that the Union had decided to accept the Company's entire contract proposal as it had existed since June 7, including the three-year contract term. The union representative also informed the Company that the Union was calling off the strike and was ready to discuss the details of the return of the striking employees, all of whom were unconditionally offering to return to work. In response Kullman stated that it was no longer possible for the Union to accept the June 7 proposals *in toto*. These proposals, he said, were no longer on the table as they had been amended at the outset of the meeting to limit the duration of the contract to the nine days left in the certification year.

The next day the Union sent the Company a telegram confirming the Union's acceptance of the Company's June 7 contract offer, the termination of the strike, and the strikers' unconditional offer to return to work. On the same day Kullman sent the Union a confirmatory letter restating the Company's position. On December 5 a union spokesman informed Kullman by telegram that the employees had ratified the

contract and the Union was now prepared to sign it.

The Administrative Law Judge found that the Company had failed to bargain in good faith, in violation of § 8(a)(5) and (1) of the Act, by insisting that any contract be limited to the nine days left in the certification year and by refusing to execute a collective bargaining agreement embodying all the proposals that had been on the bargaining table since June 7. Concluding that the June 7 proposals had never been effectively amended, he ordered the Company to execute an agreement embodying all those proposals, including the three-year contract term. The Board adopted the findings of the Administrative Law Judge, but modified the recommended order. Whereas the Administrative Law Judge had treated the amendment to the proposed duration of the contract offer as a nullity, the Board gave effect to the amendment. Consequently, it found that the parties had never reached agreement on all the provisions of the collective bargaining contract. Instead of requiring the Company to execute an agreement embodying all the proposals on the bargaining table since June 7, the Board limited the remedy to the requirement that the Company bargain with the Union and, if an understanding is reached, embody it in a signed contract.

■ Section 8(d) of the Act requires an employer to meet and confer in good faith with union representatives; to refuse to do so is an unfair labor practice proscribed by § 8(a)(5). While this obligation does not require the parties to reach an agreement, it does require that they negotiate in a spirit of sincerity and cooperation in a genuine effort to find a basis of accord. *NLRB v. Big Three Industries, Inc.*, 497 F.2d 43 (5th Cir. 1974); *NLRB v. A. W. Thompson, Inc.*, 449 F.2d 1333, 1335 (5th Cir. 1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972); *United Packinghouse Food & Allied Workers Int'l Union v.*

erly elected not to treat it as a decertification petition and so informed Kullman. The Company attempted to subpoena the list for use during the procedure before the Administrative

Law Judge. General Counsel's motion to revoke the subpoena was granted on the grounds of both relevancy and privilege. The Company does not contest this ruling.

*NLRB,* 135 U.S.App.D.C. 111, 416 F.2d 1126 (1969), *cert. denied,* 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969).

■ In evaluating the parties' good faith, the Board is not precluded from examining the substantive proposals put forth. Indeed,

> . . . if the Board is not to be blinded by empty talk and by the mere surface notions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employers in the course of bargaining negotiations.

*NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 134 (1st Cir. 1953), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). *See also A. H. Belo Corp. (WFAA–TV) v. NLRB,* 411 F.2d 959 (5th Cir. 1969); *NLRB v. Holmes Tuttle Broadway Ford, Inc.,* 465 F.2d 717, 719 (9th Cir. 1972). Insistence on a contract of unusually short duration can evidence bad faith bargaining. *NLRB v. Bagel Bakers Council of Greater New York,* 434 F.2d 884, 888 (2d Cir. 1970). Similarly, a contract limited in duration to the certification year tends to evidence bad faith bargaining. *NLRB v. Holmes Tuttle Broadway Ford, Inc., supra* ; *Solo Cup Co. v. NLRB,* 332 F.2d 447, 449 (4th Cir. 1964); *NLRB v. Henry Heide, Inc.,* 219 F.2d 46 (2d Cir. 1955), *cert. denied,* 349 U.S. 952, 75 S.Ct. 881, 99 L.Ed. 1277 (1955). Finally, withdrawal by the employer of contract proposals tentatively agreed to by both the employer and the union in earlier bargaining sessions, without good cause, is evidence of a lack of good faith bargaining by the employer in violation of § 8(a)(5) of the Act. *American Seating Co. of Mississippi v. NLRB,* 424 F.2d 106, 108 (5th Cir. 1970); *NLRB v. A. W. Thompson, Inc., supra* ; *San Antonio Machine & Supply Corp. v. NLRB,* 363 F.2d 633 (5th Cir. 1966).

■ The Company has advanced no legitimate business purpose—and we can conceive of none—for withdrawing the three-year contract term to which the Union had previously agreed and substituting in its stead a provision limiting the contract to the remaining nine days in the certification year. The obvious purpose of such a maneuver is to test the union's majority status at the earliest possible opportunity.

■ The Company contends that "unusual circumstances" justified its insistence on a contract limited to the certification year. Absent unusual circumstances, during the year following certification a union's majority status is irrefutably presumed. *Brooks v. NLRB,* 348 U.S. 96, 103–104, 75 S.Ct. 176, 99 L.Ed. 125 (1954);[2] *NLRB v. Cayuga Crushed Stone, Inc.,* 474 F.2d 1380, 1383 (2d Cir. 1973); *NLRB v. Keystone Valve Corp.,* 449 F.2d 1253 (5th Cir. 1971); *NLRB v. Holly General Co., Div. of Siegler Corp.,* 305 F.2d 670, 675 (9th Cir. 1962). Before the certification year expires, this presumption applies with "absolute force." *NLRB v. Rish Equipment Co.,* 407 F.2d 1098, 1100 (4th Cir. 1969). As the Company recognizes,[3] an employer must bargain with the certified representative during the certification year *even if the union has lost its majority status. Brooks v. NLRB, supra; NLRB v. Keystone Valve Corp., supra; NLRB v. United States Sonics Corp.,* 312 F.2d 610, 616 (1st Cir. 1963).

In *Keystone Valve,* on almost identical facts, we rejected an employer's contention that unusual circumstances justified a refusal to bargain with the union. In that case, with only eight days left in the certification year the Company refused to bargain, relying on the fact that a majority of non-strikers had attempted to file a decertification petition. We held that neither the fact that only eight days remained in the certification year nor the fact that a major-

**2.** The "unusual circumstances" to which the Supreme Court referred in *Brooks* were:

(1) the certified union dissolved or became defunct; (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; (3) the size of the bargaining unit fluctuated radically within a short time.

348 U.S. at 98–99, 75 S.Ct. at 178.

**3.** *See* p. 8 respondent's brief: "The Company does not argue with its obligation to recognize and bargain with the Union even though the union had lost its majority status."

ity of non-strikers had indicated a desire to rid themselves of the union constituted "unusual circumstances" justifying the employer's withdrawal from contract negotiations. We stressed the importance of providing the union a "fixed minimum time during which the effort to reach an agreement will not be frustrated by the Company's refusal to bargain" and stated that:

> [A] firm one year minimum requirement for good faith bargaining, in the absence of unusual circumstances, provides an understandable and easily enforceable standard. Such a standard permits both parties to adjust their bargaining strategies with regard to a day certain when the insulated bargaining period will terminate and protects the last weeks of the certification year, which may well be the most fruitful in producing a collective bargaining agreement.

449 F.2d at 1257 (footnote omitted). We find that reasoning persuasive in the case *sub judice.*

When Company representatives came to the November 29 meeting, their only knowledge concerning the union members' disenchantment with the union came from one employee, Pierria. He had said that seventy-one employees—a majority of the union members still working—had sent a petition to the Board repudiating the union. The Board merely confirmed that it had received a communication, which it had correctly decided not to treat as a petition for decertification. The Board did not tell the Company how many names were on the list. Consequently, the Company had no objective evidence that any other working employees—much less a majority thereof—were repudiating the union. This simply does not meet the "unusual circumstances" test. Moreover, the Company does not dispute the Board's position that on November 29 there were over 200 employees in the unit including strikers, nonstrikers, and replacements. *See Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S. App.D.C. 209, 466 F.2d 380, 393 (1972). Thus even if seventy-one employees had in fact signed an antiunion petition, this number would have been less than a majority.

Clearly, *minority* disaffection would not constitute an unusual circumstance.

Determining whether a party's conduct evidences a lack of good faith is an elusive inquiry; and "in this area of mixed fact and law, a court will not lightly disregard the over-all appraisal of the situation by the Labor Board 'as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.'" *NLRB v. Reed and Prince Mfg. Co., supra,* 205 F.2d at 134 (1st Cir. 1953), quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. *See also International UAW v. NLRB,* 147 U.S.App.D.C. 289, 455 F.2d 1357, 1364 (1971). We hold that substantial evidence on the record as a whole supports the Board's findings and the conclusion of bad faith it drew from them.

ENFORCED.