BURNS INTERNATIONAL SECURITY SERVICES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 76–1744 and 77–1311.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 15, 1977.

Decided Dec. 22, 1977.

James E. Hautzinger, Denver, Colo. (Charles W. Newcom, Denver, Colo., on brief), of Dawson, Nagel, Sherman & Howard, Denver, Colo., for petitioner.

Joseph A. Oertel, Washington, D. C. (William R. Stewart, Washington, D. C., on brief), John S. Irving, John E. Higgins, Jr., Carl L. Taylor and Elliott Moore, N. L. R. B., Washington, D. C., for respondent.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Burns International Security Services, Inc., (Burns) seeks review of a National Labor Relations Board (Board) order holding that Burns had unlawfully refused to bargain in violation of 29 U.S.C.A. § 158(a)(5) (Section 8(a)(5)) [1] and that it had engaged in unlawful polling or interrogation of employees in violation of 29 U.S.C.A. § 158(a)(1) (Section 8(a)(1)).[2] The dispositive facts are not in dispute.

---

**1.** 29 U.S.C.A. § 158(a)(5) provides:

(a) It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees   .   .   ..

**2.** 29 U.S.C.A. § 158(a)(1) provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in   .   .   .   this title.

On June 25, 1971, Board certified Local No. 63, International Guards Union of America (Union) as the exclusive bargaining agent for a group of Burns employees located within the states of Colorado and Wyoming. Two successive one-year collective bargaining agreements were thereafter entered into between Burns and Union. The second agreement ran from December 3, 1972 to December 3, 1973 and by its terms was to "automatically renew itself from year to year unless . . . (one of the parties) . . . gave written notice to the other . . . no less than sixty (60) days prior to December 3, 1973 . . . of its desire to terminate this agreement."

In mid-September, 1973 Union sent a letter to Burns requesting that contract negotiations for the forthcoming contract year be initiated on October 8, 1973. Burns replied on October 1, 1973 that it would refuse to bargain with Union because of its "good faith doubt" that Union continued to represent a majority of its employees. On October 2, 1973 Burns petitioned the Regional Director of Board for an election to determine if Union actually continued to represent a majority of its employees.

Within its request for an election, Burns set forth numerous factors supportive of its good faith doubt that the Union continued to represent a majority of its employees, including, *inter alia*: Union officers who comprised the negotiating committee for the bargaining agreement completed on December 3, 1972 had subsequently resigned and Burns had not been notified of the election of new Union officers; as of September 1, 1973 only 65 of Burns current work force of about 300 guards constituted those employed at the time of the March 1971 representation election; in the preceding 12 months Union filed only one grievance which was not a formal filing, but simply an attorney's letter; as of August, 1973, Union had not filed any annual reports as required by the Labor-Management Reporting and Disclosure Act; a unit employee was seeking a decertification election; and in the preceding six months it had received "various oral complaints and criticisms" about the Union from unit employees.

On January 2, 1974 the Regional Director of Board advised Burns that the information contained in its letter of October 2, 1973 supportive of its good faith doubt of Union's majority was inadequate "to demonstrate any reasonable grounds for concluding that [the Union] . . . no longer represents a majority of unit employees." The Regional Director also advised Burns that it had 48 hours within which to provide "necessary evidence" supportive of its good faith doubt of Union's majority. To this end Burns notified employees who had previously complained about Union of their opportunity to express their views in writing. Burns acquired written opinions from "some 50 employees" within the 48 hour time limit relating to complaints against the Union.

On January 17, 1974 the Regional Director dismissed Burns' election petition because the "objective considerations," including the poll, did not provide reasonable grounds for concluding that Union has lost its majority since certification. Burns appealed to the Board. On March 20, 1974, Board ordered that the Regional Director reinstate Burns' election petition and proceed accordingly.

On March 25, 1974 Union filed the charge herein alleging that Burns had unlawfully refused to bargain and that it had engaged in unlawful interrogation and polling of its employees. The Union charge thus blocked Burns' election petition. On April 3, 1975, over one year after being ordered by the Board to proceed with the election petition, the Regional Director dismissed Burns' petition with the statement that it might be "reinstated, if appropriate, upon application, after disposition of the unfair labor practice proceeding."

The Regional Director issued the instant complaint against Burns on March 5, 1975, almost one full year after Union filed its charges. Hearing was had before an administrative law judge on May 6 and 7, 1975. In a decision dated August 13, 1975 the law judge determined that Union's com-

plaint should be dismissed in its entirety. In so doing the administrative law judge noted:

> The complaint alleges that on and after October 1973, Respondent's agents polled and interrogated employees concerning their union sentiments and solicited their union withdrawals, that Respondent engaged in these acts to undermine the Union's majority and that it refused thereafter to honor its bargaining obligations. . . . Respondent's position is that it developed a good faith doubt, with ample support, as to the continuing majority status of the Union and accordingly filed the RM petition described below. [R., Vol. III, p. 425.]

> \* \* \* \* \* \*

> The theory of the General Counsel is that Respondent coerced the anti-union statements set forth above from its employees. But, as stated, I am at a loss to see how Respondent could have done otherwise, after being given 48 hours by the Regional Director to document its position. Indeed, if the letters were pro-union, and to some extent they were, the General Counsel could then contend that this refuted Respondent's claim that it had a good faith doubt about the Union's majority status. In the view of the undersigned, this smacks of Hobson's choice. [R., Vol. III, pp. 430–431.]

The administrative law judge thereafter concluded as a matter of law that Burns had not engaged in any unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act.

Upon review, the Board reversed the administrative law judge finding, *inter alia*: that Burns' reasons for asserting a good faith doubt of Union's majority status were "in many respects—either irrelevant, groundless, inaccurate, or simply not responsive"; Burns had made no effort before refusing to bargain on October 1, 1973 to determine to what extent dissatisfaction with the Union had caused employees to desire that the Union not represent them; and that the poll of the "some 50 employees" was coercive and cannot be relied upon by Burns to support its position.

On review Burns contends that: (1) since on or about October 15, 1973 it has had a good faith doubt as to the continuing majority status of Union among its guard employees; and (2) Burns properly gave certain of its employees an opportunity to express their opinions about Union.

## I.

Burns contends that since on or about October 15, 1973 it has had a good faith doubt as to the continuing majority status of Union among its employees. Burns acknowledges that it has refused to bargain with Union since that date but argues that its good faith doubt constitutes an absolute defense to any alleged violation of Section 8(a)(5). Burns urges that since it need not prove lack of Union's majority but need only "show a rational basis in fact for doubt of majority status" that the recommended dismissal order of the administrative law judge should be adopted and an election ordered.

■ We observe at the outset that the Board is not bound by findings and conclusions of an administrative judge and is free to draw its own inferences as well as conclusions when its broader experience and expertise is applicable. *Ann Lee Sportswear, Inc. v. National Labor Relations Board*, 543 F.2d 739 (10th Cir. 1976). In reviewing Board findings, a court must review the record as a whole, taking into consideration supporting as well as contradicting and conflicting evidence; however, a court may not ignore the Board's expertise or displace its findings even though it would have made a different choice. *National Labor Relations Board v. R. L. Sweet Lumber Company*, 515 F.2d 785 (10th Cir. 1975), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975). Determinations of the Board are therefore not to be set aside unless a reviewing court is convinced that the Board has acted in an arbitrary and capricious manner. *Id.*, p. 794. *See also: St. John's Hospital and School of Nursing, Inc. v. National Labor Relations*

*Board*, 557 F.2d 1368 (10th Cir. 1977). Mindful of these rules, we nevertheless hold that our careful review of the record convinces us that the Board was clearly erroneous in determining that Burns' refusal to bargain with Union was violative of Section 8(a)(5).

It is well established that a union's majority status is conclusively presumed to exist only for one year after the union is certified, after which an employer may refuse to bargain if he has a good faith, reasonable doubt of the union's majority status. *National Labor Relations Board v. King Radio Corporation*, 510 F.2d 1154 (10th Cir. 1975), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). In *Ingress-Plastene, Inc. v. National Labor Relations Board*, 430 F.2d 542 (7th Cir. 1970), the court said:

> The majority status of a union is conclusively presumed to continue for one year after the union is certified, absent special circumstances. In refusing to bargain with a certified union after the one-year period, as in the instant case, an employer violates section 8(a)(5) unless he can rebut the presumption of continued majority support by establishing either that the union has in fact lost its majority, *or that the company, in good faith, has reasonable grounds to believe that the union has lost the support of a majority of the union employees. Brooks v. NLRB*, 348 U.S. 96, 103–104, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Terrell Machine Co. v. NLRB*, 427 F.2d 1088 (4th Cir., No. 13,371, January 20, 1970); *Lodges 1746 and 743, I.A.M. & Aerospace Workers, AFL–CIO v. NLRB*, 135 U.S.App.D.C. 53, 416 F.2d 809, 812 (1969). Ingress-Plastene contends that it met its burden under either test. We hold that the company demonstrated that its refusal to bargain was predicated on a reasonably grounded good faith doubt of the union's majority and accordingly deny enforcement of the bargaining order and findings of an 8(a)(5) violation. (Emphasis supplied.)
>
> 430 F.2d, at p. 546.

In *Celanese Corp. of America*, 95 N.L.R.B. 664, 28 L.R.R.M. 1362 (1951), the Board clarified the factors which must be considered in evaluating an employer's good faith doubt:

> By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be answered in the light of the totality of all the circumstances involved in a particular case. But, among such circumstances, two factors would seem to be essential prerequisites to any finding that the employer raised the majority issue in good faith in cases in which a union had been certified. There must, first of all, have been some reasonable grounds for believing that the union had lost its majority status since its certification. And, secondly, the majority issue must *not* have been raised by the employer in a context of illegal anti-union activities or other conduct by the employer aimed at causing disaffection from the union or indicating that in raising the majority issue the employer was merely seeking to gain time in which to undermine the union.
>
> 28 L.R.R.M., at p. 1366.

Applying these standards to the facts herein, we conclude that Burns did not violate Section 8(a)(5) in refusing to bargain with Union. The dispositive dates and occurrences set forth, *supra*, warrant additional review:

> October 2, 1973: Burns filed a petition for an election to determine if Union still represents a majority of its unit employees.
>
> January 2, 1974: Regional Director notifies Burns that its election petition is not adequate and that it has 48 hours to produce additional necessary evidence.
>
> January 17, 1974: Regional Director acknowledges receipt of additional evidence in the form of 50 letters but holds that the letters "do not provide reasonable grounds that the Union has lost its majority."

March 20, 1974: Board determines that Burns' actions warrant further processing of its petition. "The Board hereby reinstates the petition and the Regional Director is directed to proceed accordingly."

March 25, 1974: Union files its complaint against Burns.

March 5, 1975: Regional Director issues Union's complaint herein.

April 3, 1975: More than one year after being directed by the Board to process Burns' election petition, Regional Director notifies Burns that because of the issuance of Union's complaint he is dismissing Burns' election petition.

May 6 and 7, 1975: Trial before an administrative law judge.

August 13, 1975: Recommended decision of the law judge states that Union's complaint should be dismissed in its entirety.

June 29, 1976: Board, on appeal by Union, reverses administrative law judge and determines that Burns has violated both Sections 8(a)(5) and 8(a)(1), effectively holding that Burns did not have a good faith doubt as to Union's majority.

Repetition of these dates and facts highlights the vexatious manner in which the Regional Director and Board treated Burns. Even though ordered by Board on March 20, 1974 to reinstate Burns' petition and proceed directly, the Regional Director declined to abide Board's order, and in lieu, unilaterally in excess of one year later, i. e., April 3, 1975, he dismissed Burns' petition. For reasons not developed in the record, Board evidently chose not to intervene in Burns' behalf for enforcement of its March 20, 1974 Order. Thereafter, notwithstanding Board's March 20, 1974 Order that Burns' election petition warranted further proceedings, i. e., inferentially, an election to determine the validity of Burns' good faith doubt of Union's majority status, Board's order of June 29, 1976 held that Burns had violated Sections 8(a)(5) and (1) and that Burns' reasons for asserting a good faith doubt were "either irrelevant, groundless, inaccurate, or simply not responsive." Board, under these circumstances, would have this court condone its actions by ordering enforcement of its order holding Burns in violation of Sections 8(a)(5) and (1). This we decline to do.

■ Burns quite adequately developed solid evidence establishing its good faith doubt relative to Union's majority status. Accordingly, we hold that Board's determination that Burns' refusal to bargain was violative of Section 8(a)(5) was arbitrary and capricious.

## II.

Burns argues that it properly gave certain of its employees an opportunity to express their opinions about Union, pursuant to the Regional Director's request of January 2, 1974 that Burns supply additional evidence supportive of its election petition.

■ As noted, *supra,* the administrative law judge was "at a loss to see how Respondent [Burns] could have done otherwise, after being given 48 hours by the Regional Director to document its position." In commenting on this procedure the Board noted:

Geraty [Burns' National Director of Industrial Relations] interpreted the letter as meaning that he had 48 hours within which to document "undisclosed number of oral complaints" referred to in the letter. Therefore, he contacted the Respondent's branch manager in Denver, Troy Marsh, and over the telephone *instructed him that the employees who had previously complained about the Union should be given an opportunity to express their opinions in writing, if they so desired. He also instructed Marsh that the employees were not to be interrogated, pressured, or pushed and that they were not required to write anything. Thereafter, Marsh relayed Geraty's instructions to his supervisors or agents who approached a number of employees, including some who possibly had not complained about the Union.*

*As the record shows, these instructions were carried out;* a number of employees were asked to give their written opinions and many, some 25 to 30 employees, were flatly requested to state their views re-

garding the Union, or unions in general, "pro or con." Also, the employees were not told the reasons why the letters were requested, nor were employees told that their responses would be kept confidential; that they would not be read by their supervisors; that the Respondent would not keep a record of their responses, pro or con; or that any record would be kept of those who did not care to respond. *On the other hand, the record shows that no employees were threatened, coerced, or intimidated into cooperating.*

In all, about 50 open letters, generally critical of the Union's dues and the Union's lack of interest, were received by the Respondent and taken to the Regional Director. In a letter dated January 17, 1974, the Regional Director acknowledged receipt of the letters and stated that following an investigation the objective considerations "do not provide reasonable grounds that the Union has lost its majority since certification [and that] further proceedings are not warranted at this time." (Emphasis supplied.) [R., Vol. III, pp. 438–439.]

The Board held this poll to be coercive and in violation of Section 8(a)(1). The Board opined that the poll by Burns failed to comply with the polling mandates of *Struksnes Construction Co., Inc.,* 16 NLRB 1062 (1967). We observe that such a determination was inconsistent, at best, in light of the fact that the Board had, in its Order of March 20, 1974, determined that the letters obtained by Burns together with the information set forth in its original petition of October 2, 1973 "alleged sufficient objective considerations to warrant further processing of the petition." Furthermore, we believe the Board's findings set forth in this part II, *supra,* belie a determination that the poll was coercive. Thus, we must hold that the poll conducted by Burns, pursuant to the Regional Director's request that Burns procure "necessary evidence" of "an undisclosed number of oral complaints" was not coercive and not violative of Section 8(a)(1).

Enforcement denied. Board is directed to reinstate Burns' election petition of October 2, 1973 and hold an election within 60 days of the effective date of this opinion. We further direct the Board to bear all costs of the election.