**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RANDLE–EASTERN AMBULANCE SERVICE, INC., and Randle Medical Sales and Rentals, Inc., Respondent.**

No. 77–3278.

United States Court of Appeals, Fifth Circuit.

Nov. 22, 1978.

Elliott Moore, Deputy Associate, Gen. Counsel, Janet McCaa, Supervisor, Michael Nicholson, Atty., N. L. R. B., Washington, D. C., for petitioner.

James S. Bramnick, Herbert B. Mintz, Miami, Fla., for respondent.

Before BROWN, Chief Judge, GOD-BOLD and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The National Labor Relations Board seeks enforcement of its order against the respondent, Randle-Eastern Ambulance Service and Randle Medical Sales and Rentals. The Board found that Randle-Eastern (the Company) violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), 158(a)(5), when it withdrew previous contract proposals from the bargaining table and substituted new proposals less favorable to the employees; that it violated §§ 8(a)(1) and 8(a)(5) when it withdrew recognition from the Union without any objective basis for reasonably doubting the Union's majority support; and that it violated § 8(a)(1) when it informed a striking employee that his reinstatement was conditioned on his resigning from the Union. The Board ordered the Company to cease and desist from the unfair labor practices found, to offer reinstatement, upon application, to all striking employees who were not permanently replaced prior to the Company's withdrawal of its previous proposals,[1] to make such employees whole for any loss of earnings they may have suffered by reason of the Company's refusal to reinstate them, to bargain with the Union, and to post the customary notices. We enforce only those aspects of the Board's order that pertain to the Company's violation of § 8(a)(1) by informing a striking employee that his reinstatement was conditioned on resignation from the Union. In all other respects, we decline to enforce the Board's order.

### The Negotiations

The Company operates a private emergency and nonemergency ambulance service in Dade County, Florida. Calls requesting ambulance service come from both private parties and from fire and police units. Sixty to sixty-five percent of the Company's calls are from fire and police units pursuant to a contract with Dade County. The amount of the fees charged for ambulance service—both for private and County calls—is controlled by the County.

In 1967, Local 500 of the Transport Workers of America (the Union) was certified as the bargaining representative of the Company's ambulance drivers, attendants, and

---

1. This relief was premised on the Board's finding that the withdrawal of the previous proposals converted an economic strike into an unfair labor practice strike. See note 11, infra.

mechanics. The Company and the Union thereafter negotiated a series of collective bargaining agreements, the last of which expired on March 31, 1976. On February 2, 1976, representatives of the Company and the Union began negotiations for a new contract.[2] Negotiations proceeded apace, the parties reaching tentative agreement on a number of provisions to be included in the new contract. But as the March 31 expiration date approached, it became apparent that the Company and the Union were still far apart on many major items. After March 22, the negotiations were held in the presence of a mediator from the Federal Mediation and Conciliation Service (FMCS).

On March 24, the Company, desiring to avoid a strike if at all possible, proposed that three items be submitted to arbitration, the arbitrator's award to be subject to approval by the County of a fee increase sufficient to cover additional costs. These items were the Union's demands for (i) a change in the work schedule from 24 hours on—24 hours off to 24 hours on—48 hours off, with no reduction in compensation, (ii) a wage increase of 10 percent immediately and 10 percent at the end of the first year, together with a cost-of-living adjustment, and (iii) improvements in the pension plan. The Union initially rejected this proposal, but it did not dismiss it out of hand.

Over the course of the next few days' bargaining, the Company made several concessions and agreed to improve fringe benefits. On March 29, the negotiators reached a tentative agreement. Their agreement, as evidenced by a synopsis prepared by the Union, provided for increases in supplemental Workmen's Compensation coverage, major medical coverage, hospitalization, and life insurance. The clauses in the proposed contract relating to management rights, sick leave, holidays, vacations, discipline, and grievance procedures were more favorable to the Union and the employees than those in the previous contract. On its part, the Union agreed to submit the issues of schedule revision, wages, and retirement benefits to arbitration.

The unit employees voted on the proposed contract on March 30 and 31. Although the Union negotiating committee unanimously recommended ratification, the employees rejected the agreement and voted to go on strike. At midnight on March 31, 166 of the 177 unit employees struck the Company.

On April 1, 1976, the County suspended the Company's contract. As a consequence, the Company's call volume and total revenue dropped off precipitously, from some 11,000 calls and $530,000 in March to 2,600 and $125,000 in April. The Company began immediately to hire replacements for the striking workers.

The next meeting took place on April 8 in the FCMS mediator's office. The Union stated that three issues were open: the shift schedule, wages, and the retirement plan. The Union withdrew its commitment to submit these issues to arbitration. The Company responded by explaining its cost problem, emphasizing (as it had throughout the negotiations) that its rates were controlled by the County. Proposals and counter-proposals on wages and shift schedules were advanced and discussed, but no significant progress was made.

At the next bargaining session on April 22, the Union continued to insist on the 24 hours on—48 hours off shift schedule with no reduction in compensation. It proposed a four-year contract to phase in the reduced work schedule, with a wage reopener after two years. After an extended discussion of this proposal, the head Company negotiator announced that the Company was withdrawing all prior offers, stating: "We've been going back and forth on the work schedules. We've been going back and forth on the wage increase. Let's get off dead center. Let me give you an entire package that you can look at and accept, reject, modify, or make proposals on. I will give you an entire package. Let's get off dead center." The parties then went into

2. Except in a few instances, the significant facts are not in dispute. Our description of the negotiating sessions reflects, except where oth- erwise noted, the facts as found by the Administrative Law Judge or as agreed to by the parties.

caucus. The mediator reported to the Company that the Union wanted all pre-strike economic concessions left "on the table," the Company's proposal for arbitration dropped, and a pending state court damage action for picket-line violence dismissed. The Company refused. Upon returning to the bargaining table, the Union demanded that whatever replacements the Company had hired be let go if necessary to make room for returning strikers. The Company replied that "that may give us some problems."

The parties met with the mediator again on May 3. According to Company witnesses, the mediator suggested to the Company negotiators that they "clear the air" on the issue of the job rights of replacements vis a vis those of returning strikers.[3] Upon meeting with the Union negotiators, the Company stated that a number of replacements had been hired and that the Company would not terminate them, but that strikers would be returned to work as vacancies occurred and would be accorded their accrued seniority. The Union continued to insist that the returning strikers be given priority over the replacements, stating that otherwise no contract could be concluded. The meeting ended, nothing else but the replacements versus returning strikers issue having been discussed.

At the next meeting on May 25, the Union stated that it would be "flexible" on the replacements versus returning strikers issue and suggested that the parties discuss the contract issues. The Company asked for time to prepare a complete contract proposal.

The parties met again on June 1. In the meantime, the County had indicated that it would restore the Company's contract. At the June 1 meeting, the Company presented a package of contract proposals that, except for the omission of a work schedule provision, constituted a complete contract. The Company's proposals were for the most part less favorable to the Union and the employees than those submitted to an employee vote on March 30, although they contained some improvements over the expired contract.[4]

After a caucus the Union noted the return of the previous contract's management rights clause and questioned the omission of a work-schedule proposal. The Company responded that it had "problems on work schedules," in that the strike and its consequences had caused the Company's needs to change. The Company asked the Union for suggestions. The Union stated that any work schedule was better than none "even if it was the same 84 hour work week, as long as the guys knew what they were going to work." The Company refused to return to the old schedule and suggested instead that schedules be posted weekly. The Union and the Company were unable to agree on a work schedule.

Two further meetings were held. On June 2, the parties met separately with the FCMS mediator. The Union modified its stance on the replacements versus returning strikers issue and made several other significant concessions. On June 7, the parties met briefly. The Company announced that it was withdrawing recognition from and refusing to bargain further with the Union because it doubted that the Union represented a majority of the employees.

### Bad Faith Bargaining

Relying principally, if not exclusively, on the Company's April 22 withdrawal of its tentatively agreed-to previous proposals and its June 1 substitution of proposals less favorable to the employees and the Union, the Board found that the Company failed to bargain in good faith. In the words of the ALJ, adopted by the Board:[5]

> I am convinced, and find, in all the relevant circumstances, that the Respondent

---

3. The Board does not mention this testimony in its decision.

4. In one respect, wage-progression, the proposed contract was less favorable than the old.

5. For the most part, the Board adopted the findings and conclusions of the ALJ.

on April 22 withdrew all offers on the table and, on June 1, substituted proposals less beneficial to the employees than those in the old contract[6] and in the tentative agreement, in order to prevent resolution of the contract issues and to undermine the Union's status as bargaining representative. Accordingly, I find, on the evidence in its entirety, that the Respondent thereby, on April 22 and June 1, failed and refused to bargain in good faith . . . . .

The Board concedes that the Company was bargaining in good faith up until April 22.

 We are mindful that our review of the Board's findings and conclusions is limited by the substantial evidence rule. As we stated in *NLRB v. Big Three Industries, Inc.*, 5 Cir., 1974, 497 F.2d 43, 46:

[O]nce the parties are physically engaged in the rituals of bargaining, as the employer and union were here, piercing through the formal litany to detect a want of good faith must rest in great measure on reasoned inferences. And it is beyond dispute that the reservoir of experience and expertise which enhances the likely reasonableness of such inferences is found in the Board itself.

The Board's conclusion of bad faith bargaining must be enforced "if it 'finds support in the record as a whole . . . even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *NLRB v. Herman Sausage Co.*, 5 Cir., 1960, 275 F.2d 229, 231, quoting *NLRB v. Fant Milling Co.*, 360 U.S. 301, 309 n. 10, 79 S.Ct. 1179, 3 L.Ed.2d 1243, enf'd on remand, 5 Cir., 1959, 272 F.2d 773. But our review is not perfunctory, for "we must make certain that the record actually and substantially supports the charge." *Herman Sausage, supra,* at 231.

 On this record we are unable to conclude that substantial evidence supports the Board's conclusion that the Company engaged in bad faith bargaining. The Board relies on the proposition that the employer's withdrawal of tentative agreements or pre-vious proposals is evidence of bad faith bargaining. As our cases make clear, we have no quarrel with that general statement. *See NLRB v. F. Stauss and Son, Inc.*, 5 Cir., 1976, 536 F.2d 60, 64; *NLRB v. Big Three Industries, Inc., supra,* at 47; *NLRB v. A.W. Thompson, Inc.*, 5 Cir., 1971, 449 F.2d 1333, 1335, *cert. denied*, 1972, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795; *American Seating Co. v. NLRB*, 5 Cir., 1970, 424 F.2d 106, 108; *San Antonio Machine & Supply Corp. v. NLRB*, 5 Cir., 1966, 363 F.2d 633, 636–37; *NLRB v. International Furniture Co.*, 5 Cir., 1954, 212 F.2d 431, 433. The withdrawal, without good cause, of previously agreed-to proposals can be strong evidence that the employer is merely stringing the Union along and that it is not bargaining with the required good faith intent to reach an agreement. But we have recognized that the withdrawal of previous proposals or tentative agreements does not establish per se the absence of good faith. *See M.R. & R. Trucking Co. v. NLRB*, 5 Cir., 1970, 434 F.2d 689; *NLRB v. Minute Maid Corp.*, 5 Cir., 1960, 283 F.2d 705. *See also NLRB v. Tomco Communications, Inc.*, 9 Cir., 1978, 567 F.2d 871, 882–83; *Collins & Aikman Corp. v. NLRB*, 4 Cir., 1968, 395 F.2d 277; *NLRB v. Alva Allen Industries, Inc.*, 8 Cir., 1966, 369 F.2d 310. The employer's actions must be viewed in the context of the negotiations in which they arose. *M.R. & R. Trucking, supra,* at 695.

 It is the failure of the Board to treat the action of the Company in context that renders its conclusions unsupportable. The proposals agreed to on March 29 were made on the eve of a strike that the Company desperately wished to avoid, for a strike almost certainly meant that the County would cancel the Company's contract for an indefinite period. In addition, the concessions embodied in the agreed-to proposals were made as part of an entire agreement, an integral part of which was the Union's agreement to submit to arbitration on the issues of wages, work schedules, and retirement benefits, the items of deepest disa-

---

6. This statement is not entirely true. *See* text and note at note 4, *supra.*

greement and greatest monetary significance.

By April 22, the necessity and advisability of the pre-strike concessions appeared in an entirely different light. The worst case had happened. A strike had occurred and the County had cancelled the Company's contract. Revenues were way down. The Union had withdrawn its agreement to arbitrate and had shown little sign of relenting on its economic demands. In these circumstances the Company's withdrawal from the previous proposals was a natural response to the economic pressures it was experiencing. By June 1, the date the Company submitted its new proposals, the situation had changed again. It was by that time apparent that the Company had won the strike, for a substantial number of replacements had been hired, an equal number of strikers had crossed the picket line and returned to work, and the Company had been assured that the County would restore its contract.

We think this case simply a classic example of what collective bargaining is all about. When the Union had the upper hand, the Union negotiators extracted as many concessions as they thought they could. However, the employees decided that the Company could be pushed further and voted to strike instead of to accept the proposed contract. The employees guessed wrong, and the Company balked instead of caving in. As the post-strike bargaining progressed, the balance of power shifted. The economic pressure on the strikers grew and that on the Company lessened. The Company's June 1 proposals reflected the Company's new estimate of its strength—an estimate that proved not far wrong, as demonstrated by the Union's acquiescence in most of the Company's proposals.

Of course, more sinister characterizations of the Company's conduct are possible. But the evidence adduced before the Board, considered as a whole,[7] does not support such a characterization. The General Counsel, the ALJ, and the Board relied almost solely on an inference from the Company's withdrawal of previous concessions. While the Board is permitted to draw inferences from the record, "[b]efore the inferences are entitled to acceptance by this Court . . . they must be founded upon proved facts, not upon speculation or suspicion." *Chevron Oil Co. v. NLRB*, 5 Cir., 1971, 442 F.2d 1067, 1069. Instead of relying on the proved facts, the Board ignored them.

In justifying its conclusion that the Company failed to bargain in good faith, the Board did not mention the Union's withdrawal of its agreement to arbitrate or the Company's loss of the County contract. In discussing the Company's argument that the withdrawal of the previous proposals was justified in light of the employees' March 30 vote the Board's only relevant comment[8] was that the withdrawal "occurred when negotiations, resumed after the strike with the aid of a mediator, were making progress toward reaching an agreement and ending the strike." This statement conveniently passes over the fact that not only was the Union insisting on all pre-strike concessions, it had withdrawn from its agreement to arbitrate certain economic demands. The statement ignores as well the fact that the Company had a right not to be pleased with whatever "progress" was being made. Finally, the Board denigrated the Company's June 1 proposals—it labeled them strong evidence of the Company's bad faith—but in so doing ignored the right of the Company to take advantage of its superior bargaining position. Indeed, the mere fact that an almost complete contract proposal was made, a proposal that was in many respects acceptable to the Union, tends to rebut affirmatively the infer-

---

7. Substantiality of the evidence is measured by consideration of all of the evidence, not just that which supports the Board. *Universal Camera Corp. v. NLRB*, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

8. The Board also stated that the Company's April 22 withdrawal of previous proposals "was not shown to be necessary in order to continue the Respondent's operation during the strike." We have no idea what the Board meant by this statement, or how whatever it meant is relevant to the question of good faith.

ence that the Company was bargaining with no good faith intent to reach an agreement.

We think this case similar to *M.R. & R. Trucking, supra,* a case in which we denied enforcement to the Board's finding that the employer had not bargained in good faith. In that case, the Board had relied heavily on two circumstances in finding a violation: the employer's withdrawal in March of 1966 of a wage proposal it had made a few days earlier and the Union had rejected; and the less favorable terms and conditions in the employer's 1967 offer than those it had tentatively agreed to grant in the 1966 negotiations. We stated:

> [T]he Board's treatment of the underlying evidence, largely undisputed, is deficient in two major respects. Recognition is not given to the hard bargaining and exertion of economic force by both sides and to the right of the company to use the stronger bargaining position in which it found itself. . . . The Board's failure to recognize the applicability of this principle is but part of a broader deficiency, which is its treatment of actions of the company as though existent in isolation, without regard to the context of negotiations in which they arose or the particular actions of the union to which they were responses.

434 F.2d at 695. The Board's finding in this case that the Company failed to bargain in good faith suffers from the same deficiencies.

### Withdrawal Of Recognition

On June 7, 1976, as mentioned above, the Company withdrew recognition from and refused to bargain further with the Union. The Company claimed a good faith doubt that the Union continued to represent a majority of the employees. The asserted grounds for this claim were "the number of new hires that we have had, the . . . people who have crossed the picket line, and . . . the people that resigned from the Union." These grounds were detailed and amplified in an affidavit sworn by the President of the Company and dated June 15.

The considerations he listed as entering into the Company's questioning of the Union's majority status were: (1) the hiring of 47 permanent replacements, some of whom had indicated their disinterest in the Union or had been victims of picket line violence; (2) the reinstatement of 46 strikers who had crossed the picket line, 19 of whom had resigned from the Union, plus the formal request of 10 others for reinstatement; (3) the resignation from the Company of 10 of the striking employees; (4) the determination of the Company not to rehire five striking employees whom it believed had participated in picket line violence; (5) the statement of the International Union representative at the June 1 bargaining session that "somewhere between 50 to 25 or 20% of the strikers were not coming back—they had just gone off"; and (6) the intent of the Company, due to economic considerations, not to hire any new employees or returning strikers except on an occasional and infrequent basis. The Board found that these considerations did not provide the required objective basis in fact to support a reasonable doubt of the Union's continued majority status and, therefore, that the Company had violated §§ 8(a)(1) and 8(a)(5) in withdrawing recognition. We hold that this finding is not supported by substantial evidence.

In the absence of special circumstances, a Union's majority status is irrebuttably presumed for a period of one year following certification or voluntary recognition. *See Brooks v. NLRB,* 1954, 348 U.S. 96, 103–104, 75 S.Ct. 176, 99 L.Ed. 125 (certification); *NLRB v. Physicians & Surgeons Community Hospital,* 5 Cir., 1978, 577 F.2d 305, 307 (voluntary recognition). After the expiration of the certification year, the presumption of the Union's continuing majority support continues but becomes rebuttable. *J. Ray McDermott & Co. v. NLRB,* 5 Cir., 1978, 571 F.2d 850, 858; *NLRB v. Gulfmont Hotel,* 5 Cir., 1966, 362 F.2d 588. A good faith doubt of the union's majority status is a defense to a refusal to bargain charge based on the withdrawal of recognition. That doubt must rest on "objective

evidence," *J. Ray McDermott, supra,* and "may not depend solely upon unfounded speculation or a subjective state of mind." *Gulfmont Hotel, supra,* at 589. But the employer need not conclusively demonstrate that a majority of his employees no longer desire to be represented by the Union.

■ In the circumstances presented here, we think the presumption of majority status sufficiently undermined by the objective evidence to support a reasonable doubt of continued majority status. At the commencement of the strike, March 31, the bargaining unit numbered 177, of whom 166 joined the strike. By June 7, however, the Company was possessed of three items of objective evidence that, considered collectively, supported its doubt of the Union's continued majority support.

■ First, 46 of the original strikers had returned to work, and 10 had requested reinstatement and were on a preferential hiring list. In discounting the value of this evidence, the Board relied on the principle that an employee's return to work during a strike does not by itself provide a reasonable basis for presuming he has repudiated the Union as his bargaining representative. *See Retired Persons Pharmacy v. NLRB,* 2 Cir., 1975, 519 F.2d 486, 490; *Rogers Mfg. Co. v. NLRB,* 6 Cir., 1973, 486 F.2d 644, *cert. denied,* 1974, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288; *Allied Industrial Workers, Local Union No. 289 v. NLRB,* 1973, 155 U.S.App.D.C. 112, 125, 476 F.2d 868, 881. But other factors present here gave the Company a reasonable basis for believing that a good number of the returning strikers no longer supported the Union. The Company had received copies of Union resignation letters from 19 returning strikers[9] and had received information that other reinstatements had also resigned from the Union. Although nonmembership alone does not necessarily indicate nonsupport, see *NLRB v. Vegas Vic,* 9 Cir., 1976, 546

F.2d 828, 829, resignation after crossing the picket line in a fairly acrimonious strike does.

■ Second, the Company had hired 47 permanent replacements, of whom six had indicated disinterest in the Union or had been the victims of picket line violence. In the proceedings below, the Board rejected this as evidence of loss of Union support in the workforce, relying on the presumption that new employees "support the Union in the same ratio as those they have replaced." This presumption is usually applied when the employer has experienced high turnover and is trying to escape his bargaining obligation by citing that turnover as his "objective evidence." *See J. Ray McDermott & Co., supra,* at 859; *NLRB v. Washington Manor, Inc.,* 6 Cir., 1975, 519 F.2d 750, 753. In our view, however, the presumption does not apply where the "turnover" results from replacement of strikers. *See* R. Gorman, Labor Law 112 (1976): "[I]f a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker, or worse), it is generally assumed that he does not support the Union and that he ought not to be counted toward a Union majority." This is especially true where, as here, the Union is asserting at the bargaining table that the replacements will have to be discharged in order to make room for returning strikers. *See Beacon Upholstery,* 1976, 226 N.L.R.B. 207.

■ Third, the Company had been informed by a Union representative that "50 to 25 or 20%" of the strikers would not be returning to work. In most circumstances, as the Board observed, economic strikers must be considered as part of the employer's workforce in determining the Union's support. *See NLRB v. F. Strauss & Son, Inc.,* 5 Cir., 1976, 536 F.2d 60; *C.H. Guenther & Son v. NLRB,* 5 Cir., 1970, 427 F.2d 983, 986–87, *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246; *NLRB v. Crimp-*

---

**9.** Although the Company did not produce the letters themselves, the Company President provided the names of these individuals by affidavit. The Board commented adversely on the failure to produce the letters, but did not find that the Company President lied about their existence. Rather, it incorrectly stated that the letters were from permanent replacements, then discounted their value as indications of Union disaffection.

*tex, Inc.,* 1 Cir., 1975, 517 F.2d 501, 505. In this case, however, we think that the Union representative's admission permitted the Company to eliminate one-fourth to one-half of the striking employees when calculating the Union's support. It has been held, for example, that an employer may rely on a Union officer's admission that the Union has lost majority support as objective evidence to support a good faith doubt. *Lodge 1746, IAM v. NLRB (United Aircraft Corp.),* 1969, 135 U.S.App.D.C. 53, 57–58, 416 F.2d 809, 813–14, *cert. denied,* 1970, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752.

We do not deny that this is a close case. The above factors do not translate readily into a precise numerical estimate of the Union's strength, but we do not consider this fatal to the Company's case. The Company need not have conclusive proof that a majority of employees do not support the Union. Indeed, the only way that it could have garnered such proof was by an employee poll, but that is forbidden unless the employer has "objective evidence to support a good faith doubt of majority status," the same standard used to determine the lawfulness of withdrawing recognition. *Montgomery Ward & Co.,* 1974, 210 N.L.R.B. 717.[10]

Unlike many other cases in which the Courts of Appeals have upheld the Board's determination that the employer did not have a reasonable basis for doubting the Union's majority status, the Company's doubt here was not based solely upon "speculative and subjective" evidence, *Orion Corp. v. NLRB,* 7 Cir., 1975, 515 F.2d 81, dependent upon "isolated reports" from "vague and unidentified sources," *Terrell Machine Corp. v. NLRB,* 4 Cir., 1970, 427 F.2d 1088, *cert. denied,* 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91, or predicated upon the President's "feeling" that the Union had lost majority support, *NLRB v. Schill Steel Products, Inc.,* 5 Cir., 1973, 480 F.2d 586. Rather, the Company made permissible inferences from solid evidence—the number of returning strikers, the Union resignations, the number of replacements, and the Union representative's remark—which in our view were sufficient to support a reasonable doubt of the Union's continued majority status. *See Burns International Security Services, Inc. v. NLRB,* 10 Cir., 1977, 567 F.2d 945, 949–50; *National Cash Register Co. v. NLRB,* 8 Cir., 1974, 494 F.2d 189, 194–95. The Board's determination otherwise rested on presumptions we deem inapplicable, on the rejection of inferences we consider permissible, and on an assumption that the Union's loss of support, if any, was due in part to Company conduct (withdrawing previous proposals) [11] that we

10. The employer can file a decertification petition with the NLRB. When unfair labor practice charges are pending, however, the NLRB will apply the "blocking charge" doctrine and decline to process the petition. *See Templeton v. Dixie Color Printing Co.,* 5 Cir., 1971, 444 F.2d 1064. In this case, the Company filed a petition on June 8, and the Regional Director refused to process it after the Union filed the 8(a)(1) and 8(a)(5) charges.

11. While the Board made no specific finding that the Company's bad faith bargaining contributed to the Union's loss of support, the Board noted, and apparently relied upon, its finding that "the record does not show how many Union members decided to resign their membership as a result of the Respondent's conduct found to be in violation of Section 8(a)(1) and (5) of the Act." Furthermore, the Board found (contrary to the ALJ) that the Company's bad faith withdrawal of previous proposals on April 22 "seriously impeded the success of the negotiations and thus prolonged

the strike and its settlement," and therefore concluded that the economic strike was converted into an unfair labor practice strike on April 22. If we had enforced this aspect of the Board's order, our discussion of the refusal to bargain finding based on the June 7 withdrawal of recognition would necessarily have been quite different. *See NLRB v. Anvil Products, Inc.,* 5 Cir., 1974, 496 F.2d 94; *NLRB v. Frick Co.,* 3 Cir., 1970, 423 F.2d 1327, 1334.

Although we enforce the Board's finding that the Company violated § 8(a)(1) by informing a striking employee that reinstatement was conditioned on resignation from the Union, we do not believe that on this record this unfair labor practice contributed in any significant way to the Union's loss of majority support. As detailed below, the 8(a)(1) violation is predicated on *one* remark by a Company representative to at most three employees, only one of whom returned to work, and there is no evidence in the record to indicate that any other employee was informed that reinstatement was conditioned on resignation. Like the Eighth Circuit

have determined to be entirely lawful. The Board's finding is not supported by substantial evidence.

### The 8(a)(1) Violation

On June 3, 1976, Leonard Provenzano, the Company's chief of operations, met with three strikers—Chris Duffey, Edward Haney, and Norman Turek—concerning their requests for reinstatement. According to Turek, Provenzano told the strikers that "they expected us to resign from the Union." Provenzano denied making the statement; Haney testified that no such statement was made.

Sometime in late June or early July, Charles O'Conner, the Company's Vice-President, called Turek regarding his request for reinstatement. According to O'Conner, Turek told him that "I guess I'll have to resign from the Union," explaining that Provenzano "had implied to him that he could have to." O'Conner testified that he told Turek "that he could take it straight from me that it didn't make any difference what organization he belonged to, and that I was only interested in filling an ambulance service position." Turek replied that he would have to discuss the matter with his wife. He never got back in touch with the Company.

According to Company witnesses O'Conner and William Randle, President of Randle-Eastern, Company policy required that all applicants for reinstatement be referred to one of them. Randle testified further that it was never Company policy to require returning strikers to resign from the Union and that he never inquired if an applicant had done so. Turek himself testified that he was not aware of any other employee who was told that resignation was a condition of reinstatement.

 The ALJ and the Board credited Turek's testimony and discredited Provenzano's and Haney's. Credibility resolutions of the ALJ and the Board are entitled to

affirmance unless they are inherently unreasonable or self-contradictory. *NLRB v. National Fixtures, Inc.*, 5 Cir., 1978, 574 F.2d 1305. The Board's crediting of Turek is neither. The Board found further that O'Conner's repudiation of Provenzano's statement, while it had the potential of neutralizing the earlier statement, was "so remote in time as to vitiate its effectiveness." This finding is also reasonable and does not depart from prior Board precedent. *Cf. Steve's Sash & Door Co.*, 1967, 164 N.L.R.B. 468, 475–76, modified in other respects, 5 Cir., 1968, 401 F.2d 676 (repudiation effective because, inter alia, it was made within one day of otherwise coercive statement); *NLRB v. Armstrong Tire & Rubber Co.*, 5 Cir., 1955, 228 F.2d 159, 161 (upholding Board's determination that later assurances of neutrality did not erase coercive effect of prior statement).

We therefore uphold the Board's finding that the Company violated § 8(a)(1) by informing an employee that his reinstatement was conditioned on resignation from the Union. Those parts of the Board's order that we enforce, then, are those requiring the Company to cease and desist from telling striking employees applying for reinstatement that they have to resign from the Union, to post a notice stating the same, and to notify the Regional Director of the steps taken in compliance.

ENFORCED IN PART; ENFORCEMENT DENIED IN PART.

---

in *National Cash Register Co. v. NLRB*, 8 Cir., 1974, 494 F.2d 189, 195, we think that "the record . . . fails to disclose any substantial evidence from which a permissible inference could be made that the unfair labor practices contributed generally to the possible loss of majority status by the union."