**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALTERMAN TRANSPORT LINES, INC., Respondent,**

and

**Sidney Alterman, Additional Respondent in Contempt.**

No. 71–2548.

United States Court of Appeals, Fifth Circuit.

Jan. 8, 1979.

Paul Elkind, Asst. Gen. Counsel for Contempt Litigation, Peter Ames Eveleth, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D.C., Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., Vivian Asplund Miller, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Washington, D.C., for petitioner.

Granville M. Alley, Jr., Tampa, Fla., William R. Radford, Miami, Fla., Sidney Alterman, Pres., Alterman Transport Lines, Inc., Opa Locka, Fla., Willis S. Ryza, Matthew R. McArthur, Marc A. Dorenfeld, Chicago, Ill.,

Thomas C. Garwood, Jr., Orlando, Fla., for respondent.

ON PETITION FOR ADJUDICATION IN CIVIL CONTEMPT AND FOR OTHER CIVIL RELIEF.

Before BROWN, Chief Judge, AINSWORTH and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

On October 4, 1972, this Court ordered Alterman Transport Lines (the Company) to bargain with Teamsters Local 390 (the Union) as the representative of certain of the Company's Miami terminal employees. *NLRB v. Alterman Transport Lines, Inc.,* 5 Cir., 1972, 465 F.2d 950. On July 25, 1975, the National Labor Relations Board petitioned this Court for an adjudication that the Company and its President, Sidney Alterman, had committed a contempt of that judgment. The Board's petition alleged that the respondents had not bargained with a good faith intent to reach an agreement—as evidenced by Alterman's withdrawal of previously agreed-to contract proposals, substitution of new and more onerous proposals, and disavowal of the authority of the Company's negotiators to conclude an agreement—and that the respondents had unlawfully withdrawn recognition from and refused to bargain further with the Union. We referred the case to a Special Master to hear evidence and make recommended findings of fact and conclusions of law. After extensive hearings, the Special Master concluded that the NLRB had not demonstrated by clear and convincing evidence that the respondents had disobeyed our 1972 order in any respect and recommended that the Board's petition for adjudication in civil contempt be denied. We reject the recommendations of the Special Master, adjudicate the respondents in civil contempt, and retain jurisdiction for the purpose of defining the remedy and for such other and further orders as may be proper.

*I. The Appropriateness Of The Forum*

The respondents argue that the facts alleged in the Board's petition do not "legally

warrant" the institution of contempt proceedings because the conduct involved is not fairly related to that involved in the unfair labor practice which inspired the issuance of our 1972 order. The prior proceedings in this Court arose out of a so-called "technical" refusal to bargain—an 8(a)(5) refusal to bargain charge invited by the employer as his only means of obtaining judicial review of the Board's ruling in a representation case. *See Magnesium Casting Company v. NLRB,* 1971, 401 U.S. 137, 139, 91 S.Ct. 599, 27 L.Ed.2d 735. The crucial issue in the present proceedings, on the other hand, is whether the respondents bargained with the required good faith intent to reach an agreement. Since intent was wholly irrelevant in the prior proceedings, the respondents contend, "the conduct here alleged [is not] within the scope of the prior decree." They rely principally on *NLRB v. Reed & Prince Mfg. Co.,* 1 Cir., 1952, 196 F.2d 755.

In *Reed & Prince,* the NLRB petitioned the First Circuit for an adjudication that the respondent employer had violated a 1941 decree of that Court directing the employer to bargain collectively with the Steelworkers Organizing Committee. The Steelworkers Organizing Committee had become the United Steelworkers of America in 1942, and the employer had bargained with the Steelworkers until sometime in 1944. At that time bargaining relations lapsed, apparently because the Union had lost its majority status. In 1950, however, the Board again certified the Steelworkers as the bargaining representative of the respondent's employees. The bargaining conduct of the employer following the 1950 certification formed the basis of the NLRB's contempt charge. Before the filing of the contempt petition, the NLRB had proceeded against the employer in unfair labor practice proceedings, which had resulted in 1951 in a Board order to bargain, but the NLRB chose not to petition for enforcement.

The First Circuit, in an opinion by Chief Judge Magruder, declined to entertain the petition for adjudication in civil contempt. Judge Magruder expressed concern that, in view of the common issuance of broad decrees in labor cases, permitting the Board generally to proceed by a contempt petition would result in the courts of appeals "gradually supplant[ing] the Board as the primary trier of facts when future unfair labor practices are alleged." 196 F.2d at 759. The Court decided that, on the facts presented, it would be more appropriate for the Board to proceed by petitioning for enforcement of its 1951 order. Judge Magruder stated:

> Where the alleged contempt is the failure of the employer to take affirmative steps directed in our decree with a view to redressing the specific unfair labor practices, such, for example, as a reinstatement order or an order for the posting of notices, we would certainly entertain a petition by the Board for adjudication in civil contempt, . . . Also, there may be circumstances in which we would deem it appropriate to entertain such a petition where alleged conduct of the employer, which would constitute a new unfair labor practice, would also be in violation of our all-inclusive cease and desist order. We shall not undertake now to define what those circumstances might be. We content ourselves with saying that the balance of considerations is against a proceeding by way of contempt at this time, under the circumstances now before us, particularly in view of the fact that the Board has already instituted and completed a new unfair labor practice proceeding against the company under § 10 of the Act culminating in a new order, which the Board could ask us to enforce. The present petition, as the Board concedes, is addressed to our discretion.

196 F.2d at 760.

██ It is apparent from Judge Magruder's discussion that the First Circuit did not hold in *Reed & Prince* that it lacked jurisdiction over the contempt petition. To

the extent that the respondents are arguing that we are without power to hold them to the terms of our 1972 order, *Reed & Prince* is therefore of no help to them. The controlling precedent on this point is *NLRB v. American Mfg. Co.*, 5 Cir., 1943, 132 F.2d 740. In that case, the respondent contended that the conduct alleged to be contumacious bore no connection with, and no relation or similarity to, the conduct which brought about the former decree. We replied succinctly:

> [The argument] that the scope of the decree, consented to by them, and long since become final, may now be limited short of its terms, is wholly without merit, for a decree entered with jurisdiction must be obeyed as entered. It may not be defied or disobeyed. Its terms are clear and comprehensive and if they read more broadly than respondent intended that they should, the time and manner of avoiding that breadth was by objections to the decree before its entry and not by disobedience of it afterwards.

*Id.* at 742. *See also McComb v. Jacksonville Paper Co.*, 1941, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599; *NLRB v. Schill Steel Products, Inc.*, 5 Cir., 1973, 480 F.2d 586. If the respondents failed to bargain in good faith, they have violated the express terms of our 1972 order. And, while the Board's petition "is addressed to our discretion," see *Reed & Prince, supra,* we see no reason to decline to entertain it.[1]

## II. The Facts, Briefly

Many of the facts involved in this case are undisputed, and the Master made spe-

cific findings on many of the significant factual disputes.[2] After review of the Master's findings, we have concluded that, to the extent that they concern credibility choices and evidentiary facts, those findings are not clearly erroneous and are therefore entitled to acceptance by this Court. *See NLRB v. J. P. Stevens & Co.*, 5 Cir., 1976, 538 F.2d 1152, 1160–62; *NLRB v. Crown Laundry & Dry Cleaners, Inc.*, 5 Cir., 1971, 437 F.2d 290, 293; *NLRB v. Alamo Express, Inc.*, 5 Cir., 1968, 395 F.2d 481, 482; F.R. Civ.P. 53(e).[3] The statement of the facts that follows reflects facts as agreed and facts as found by the Master.

Alterman Transport Lines is an interstate trucking company engaged primarily in the shipment of perishable commodities ("wet freight"), with authority to handle some nonperishable commodities ("dry freight"). The Company operates a number of terminals in several states, and its principal terminal and headquarters are in Miami, Florida. Collective bargaining contracts with a union are in force only at the Chicago and New Jersey terminals.

Sidney Alterman is President and chief operating officer of the Company. He and his blood relatives own 98% of the Company's stock. As the Master found, Sidney Alterman, "from the inception of the Company's business, has been active in all phases of its operation, and the fact that Sidney Alterman is known to make almost all of the Company's decisions is undisputed."

After entry of the bargaining order by this Court, the Union requested the Compa-

1. Unlike *Reed & Prince,* the conduct alleged to be contumacious followed directly upon entry of the decree. There have been no intervening events or changed circumstances, and the Company cannot argue that the broadness of our decree or the passage of time renders it unfair to hold them to the terms of the order. Finally, in contrast to the situation in *Reed & Prince,* where the Board had completed an administrative unfair labor practice proceeding, a lengthy hearing before the Master has already been conducted.

2. The Special Master did not make detailed findings on every evidentiary matter, and the Board seems to suggest that this somehow af-

fects the scope of our review. We do not consider the making of such detailed findings necessary or desirable in every case. *See Ruby v. American Airlines, Inc.*, 2 Cir., 1964, 329 F.2d 11, *vacated on other grounds,* 1965, 381 U.S. 277, 85 S.Ct. 1456, 14 L.Ed.2d 430. The Master made specific findings on the factual issues he thought dispositive, and other of his findings may be inferred from his conclusions.

3. We defer discussion of our reasons for rejecting the Master's finding of ultimate fact that the evidence did not clearly and convincingly establish a failure to bargain in good faith. *See* Part III, *infra.*

ny to commence bargaining. The Company agreed to meet, and the first meeting was held on November 20, 1972. Between that date and December 30, 1974, the date that negotiations ceased, representatives of the parties met 25 times. Bargaining sessions were held on the following dates:

| 1973 | 1974 |
|---|---|
| February 8 | January 10, 11, 18 |
| March 2, 8, 9, 15, 27 | February 14, 21 |
| April 5, 25 | April 9 |
| May 10 | May 9 |
| June 8 | June 19 |
| July 31 | August 15 |
| September 19 | November 7 |
| October 2 | December 30 |
| December 11 | |

The principal negotiator for the Union was Travis Dumas, Secretary-Treasurer and later President of Local 390, who was present at all meetings except the last. The chief Company negotiator was J. L. Pfeiffer, the Company's Vice-President of Operations, who was present at all of the meetings. Assisting him were two lawyers from an Orlando firm, James Wharton and Thomas Garwood. Alterman himself attended the first meeting and the last three.

Resolving conflicts in the testimony, the Master found that Alterman reserved a right of ratification at the November 20, 1972 meeting. Crediting the testimony of Alterman and Pfeiffer, the Master found that immediately after Dumas advised the Company that any negotiated agreement would be subject to the approval of the employees and the International Union, Alterman stated that it would be necessary for the Company's "executive committee" to ratify any agreement arrived at by the negotiators. In fact, as Alterman admitted at the hearing, the Company did not have an executive committee, and the reserved right of ratification was Alterman's alone to exercise.

At this first meeting, Dumas proposed the "Green Book"—the Teamsters National Master Freight Agreement covering over-the-road drivers—as the Union's initial contract offer. The Company responded that the Green Book was written for dry freight companies and that many of its provisions were inapplicable to the Company's wet freight operations. The Union negotiators indicated that they would take this concern into account as negotiations developed.

At the next meeting, held February 8, 1973, the negotiators agreed to resolve non-economic items before taking up economics. The Company and the Union then began serious bargaining. Several of the Union's Green Book proposals were discussed.

Bargaining over the next nine months was inhibited by a dispute over the scope of the bargaining unit. The parties disagreed about whether owner-operators were members of the bargaining unit represented by the Union. The NLRB had explicitly reserved this question in the representation decision we upheld in 1972. The issue came to a head in March 1973, when Jesse Hogg, an attorney, sent a letter to both Dumas and Alterman in which he claimed to represent 75 owner-operators who desired the Union to cease any efforts to represent them. A meeting was held with Hogg on March 15, 1973, which representatives from both the Union and the Company attended. A unit clarification petition was filed shortly thereafter, and the dispute was not resolved until November 1973, when the Board upheld a July 1973 decision of the Regional Director finding that the owner-operators were not part of the bargaining unit.

Despite the Company's consistently asserted position that the existence of the owner-operator dispute made it almost impossible to put together a complete contract, the parties continued to meet and negotiate during the pendency of the dispute. The Company made counterproposals to the Union's Green Book proposals, and agreement was reached on several items. Though slowed, negotiations were not completely frustrated by the owner-operator dispute.

At the meeting of January 10, 1974, the second one held after NLRB resolution of the unit clarification question, the Company negotiators presented Dumas with a "status sheet" summarizing the negotiations to date. A copy of that document follows.

January 9, 1974

| NAME OF SECTION | STATUS | DATE |
|---|---|---|
| Preamble | OK | 3–8–73 |
| Contract Practice | OK | 12–11–73 |
| Bargaining Unit | Redraft but OK | 12–11–73 |
| Scope of Agreement | Hold | Discussed 12–11 |
| Separability & Savings | OK | 12–11–73 |
| Work Week & Work Day | Hold | Set 5–10 |
| Meals | Hold | Discussed 12–11 |
| Unassigned employees | Hold | Discussed 12–11 |
| Pay Period | Hold | Discussed 12–11 |
| Wages | Hold | Discussed 12–11 |
| Holidays | Hold | Discussed 12–11 |
| Vacation | Hold | Discussed 12–11 |
| Seniority | Hold | Discussed 12–11 |
| Federal & State Regulations | OK | 12–11 |
| Non Discrimination | OK | 4–25 |
| Stewards | OK | 12–11 |
| Management Rights | OK | 12–11 |
| Work Rules | Hold | Set 3–9 |
| Grievance/Arbitration | OK | 12–11 |
| Work Stoppage/Lock Out | Hold | 12–11 |
| Sick Leave | Hold | Set 3–9 |
| Jury Duty | OK | 3–9 |
| Discipline | Hold | Set 5–10 |
| Interchangeability | Hold | Discussed 7–31 |
| Employee Examinations | Hold | Set 5–10 |

RECAP: 10 articles agreed to
15 hold

After three meetings in January and two in February, another status sheet was prepared and mailed to the Union. It is set forth below.

| NAME OF SECTION | STATUS | DATE |
|---|---|---|
| Preamble and Existing Operating Practices | OK | . 3–8–73, 2–21–74 |
| Contracting Parties | OK | 12–11–73 |
| Bargaining Unit | OK | 1–11–74 |
| Scope of Agreement | HOLD but OK | Discussed 1–11–74 |
| Separability & Savings | OK | 12–11–73 |
| Work Week & Work Day | HOLD | Set 5–10–73 |
| Meals | OK | 1–10–74 |
| Unassigned employees | W/drawn | 1–11–74 |
| Pay Period | OK | 1–10–74 |
| Wages | HOLD | Discussed 12–11–73 |
| Holidays | HOLD | Discussed 12–11–73 |
| Vacation | HOLD | Discussed 12–11–73 |
| Seniority | OK | 1–10–74 |
| Federal & State Regulations | OK | 12–11–73 |
| Non Discrimination | OK | 4–25–73 |
| Stewards | OK | 12–11–73 |
| Management Rights | OK | 12–11–73 |
| Work Rules | OK | 2–21–74 |
| Grievance/Arbitration | OK | 12–11–73 |
| Work Stoppage/Lock Out | OK | 2–14–74 |
| Sick Leave | HOLD | Set 3–9–73, 4–4–73 |

| NAME OF SECTION | STATUS | DATE |
|---|---|---|
| Jury Duty | OK | 3–9–73 |
| Discipline | OK | 2–14–74 |
| Interchangeability | HOLD | Discussed 2–14–74 |
| Employee Examinations | OK | 2–17–74 |
| Maintenance of Standards | OK | 1–11–74 |
| Existing Operating Practices | ? See Preamble | 2–14–74 |
| Hiring of Personnel | OK | 1–10–74 |

Note: As of 2–21–74 the following Articles or Topics are either being held for economic reasons or have not been specifically discussed during negotiations.

1. Wages
2. Holidays
3. Vacation
4. Sick Leave
5. Health & Welfare
6. Pension
7. Work Day/Work Week
8. Overtime
9. Length of Contract
10. Check Off

In both of these documents, the dates listed refer either to the date on which the section was discussed or the date on which the negotiators reached some sort of understanding. Just what was the nature of that understanding was a matter of some conflicting testimony. According to Dumas, the notation "O.K." beside a contract article meant that the parties had reached an agreement. Garwood, who had prepared the status sheets, testified that the notations "O.K." and "agreed to" meant only a tentative agreement and "not a firm, final binding thing." Pfeiffer testified that the notation "O.K." meant "different things to different parts of the contract. O.K. could have meant that the subject matter was fine for discussion . . .." Based on this testimony, the fact that the "Pay Period" and "Grievance and Arbitration" provisions were reopened and discussed further after they had been designated "O.K.," and his observation that such reopening and further discussion is customary in labor negotiations, the Master found that "the evidence does not clearly and convincingly establish that the Company's representatives use of 'O.K.' on the summary sheets or memoranda meant that a final and irrevocable agreement had been reached on certain contract provisions so as to bar any possibility of future discussion or subsequent change without the Union's approval."

The next meeting following the submission of the second status sheet was held on April 9. At that meeting, the negotiators

reviewed the agreements reached and made several corrections in the language. The discussion then turned to economics. For several months prior to this meeting, Dumas had been pressing the Company to make an economic proposal, without success. On March 8, he had been advised by Garwood that Company Vice-President and negotiator Pfeiffer was in the process of evaluating the Company's financial position. At the April 9 meeting, Pfeiffer reported that the Miami terminal was not in particularly good shape, then stated that the economic proposal was not yet complete. This announcement was followed by a discussion of the possibility of an interim wage increase for unit employees.[4]

After the April 9, 1974 meeting, Garwood and Pfeiffer informed Alterman that Dumas wanted to get into economics and was pressing for a complete contract proposal. Prior to this time, Alterman's involvement in the negotiations had been minimal. He had attended the first meeting, but none thereafter. The Master found that Alterman had been advised of the general progress of negotiations and had been apprised of specific issues when such matters either called for an immediate decision—e. g., Union requests to post notices, for disclosure of financial information, and for release of names and addresses of employees—or raised issues with which the Company negotiators were not familiar—e. g., the question whether employed drivers who became owner-operators would be entitled to return to bargaining unit jobs if they could not make it as owner-operators. But Alterman "did not . . . become directly involved in the submission, clearance, or review of contract proposals until he was asked to do so by Garwood and Pfeiffer after the meeting of April 9, 1974."[5] The

Company negotiators were not instructed to and did not on any occasion clear contract proposals or tentative agreements with Alterman.

Sometime after April 9, Alterman began to review a negotiation file kept in his office. In the words of the Master, Alterman "found that the contract draft contained major and minor errors, it omitted items which needed to be covered, and included some terms which were not acceptable to him. In his opinion, the draft was incomplete and unworkable." Alterman began to redraft portions of the contract based on agreements of other companies and discussions with a labor lawyer from a different firm than that which Wharton and Garwood were members of.

The next two meetings were held on May 9 and June 19, 1974. Negotiations stalled, principally because the Company had yet to present its economic proposal. The Company negotiators were unaware of Alterman's dissatisfaction with the tentative agreements on noneconomic matters.[6]

At the August 15, 1974 bargaining session, Alterman appeared at the bargaining table for the first time since November 22, 1972. At this meeting Alterman proposed additions, deletions, and modifications to articles which had previously been designated "O.K." by the Company and Union negotiators and advanced proposals on items which the negotiators had not previously considered. There is some dispute over the extent to which Alterman's proposals affected the substance of the previous agreements, an issue that the Master did not specifically address. We defer discussion of the specifics of Alterman's proposals in order to promote clarity and avoid repetition. After he had gone over his proposed

---

4. The question of an interim wage increase was raised by David Levine, the Company's Miami terminal manager. The Company negotiators were not aware that Alterman had any intention of granting an interim wage increase. When asked at the hearing why he had not informed his negotiators of his intentions, Alterman replied, "That's just the way I do things."

After Levine had made his announcement, the company negotiators went into caucus and contacted Alterman. Upon returning to the bargaining table, they tabled the wage increase issue.

5. The quote is from the Special Master's report.

6. There was also some further discussion of an interim wage increase. No increase was ever put into effect.

changes, Alterman told Dumas that just because he was not taking positions on some articles did not mean that he would not propose further changes in the future.

Dumas was considerably upset at the course negotiations were now taking. He accused Alterman of bad faith bargaining, to which Alterman replied that the proposed changes were made pursuant to his reserved right of ratification. After a heated discussion, Dumas suggested that the parties schedule another meeting, this time with their attorneys present.

The next meeting was held on November 7, 1974. Attorneys for both the Union and the Company were in attendance. After some preliminary skirmishing, Dumas asked whether the Company had a complete contract proposal to present. The Company negotiators replied that they did not. Alterman then submitted more proposed changes in the tentatively agreed-to articles and stated that he intended to present several other items and some different versions of other articles, but that he was not yet ready to do so. The meeting adjourned, the parties agreeing to schedule further negotiating sessions.

Because of scheduling problems the next and final meeting was not held until December 30, 1974. In the meantime Alterman had received a petition signed by 80 to 90 percent of the unit employees stating that they did not desire further representation by the Union. The discussions at the December meeting concerned the significance of the employee petition. The meeting ended when the Company broke off bargaining.

### III. The Special Master's Ultimate Findings And The Clearly Erroneous Rule

The Special Master found that the evidence did not clearly and convincingly establish that the respondents failed to bargain in good faith. The Master's reasoning was as follows: (i) Alterman lawfully reserved a right of ratification at the first bargaining session; (ii) Because of the unique nature of the Company's business, a great deal of "spade work" was necessary

before it would be possible to negotiate a final agreement; (iii) That initial spade work was not completed until the summer of 1974; (iv) At that time, Alterman entered the negotiations and began to "fashion an agreement which would be acceptable to him, consulting the results of this 'spade work' done by the negotiators and other agreements entered into by other companies"; (v) Alterman's conduct at the August 15 and November 7 meetings was not unreasonable or in bad faith because he was merely exercising his lawfully reserved right of ratification.

 In reviewing the Master's findings we are mindful of our limited authority under the clearly erroneous rule. But we are also mindful that the clearly erroneous standard does not apply to findings made under an erroneous view of controlling legal principles. *See Parson v. Kaiser Aluminum & Chemical Corp.*, 5 Cir., 1978, 575 F.2d 1374, 1382; *United States v. Jacksonville Terminal Co.*, 5 Cir. 1971, 451 F.2d 418, 423–24, *cert. denied*, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. In addition, inferences from evidentiary facts and findings of ultimate fact are subject to broader review than findings of evidentiary fact. *United States v. Makris*, 5 Cir., 1976, 535 F.2d 899, 907. *See Parson, supra*, at 1382–83; *Jacksonville Terminal, supra* at 423–24.

We think the Master's ultimate findings infected by a misunderstanding of the applicable law. The following paragraph from the Master's opinion illustrates the point:

> As previously stated, I find that Alterman did inform the Union representatives at the outset in 1972 that any agreement arrived at by the negotiators was subject to ratification by his company's executive committee. I also have found that it is normal and customary to reopen consideration of individual clauses and provisions until such time as a complete proposed contract, acceptable to both sides in all respects, has been put together and signed. *It follows that* Petitioner has not carried its burden of showing by clear and convincing evidence that Re-

spondents are guilty of contempt due to Alterman's actions at the August 15, 1974 meeting and during the period immediately preceding it. [Emphasis added].

■ We do not dispute that an employer may lawfully reserve the right to ratify the product reached at the bargaining table. The Master erred, however, in placing "unwanted reliance" upon the reservation of a right to ratify. *See NLRB v. Industrial Wire Products*, 9 Cir., 1972, 455 F.2d 673, 678–79; *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 9 Cir., 1972, 465 F.2d 717; *Great Western Broadcasting Corp.*, 1962, 139 N.L.R.B. 39, 133. As these cases illustrate, actions taken pursuant to a reserved right of ratification must be closely examined to determine whether those actions are consistent with the requirements of good faith bargaining. Similarly, the Master put altogether too much emphasis on the tentative nature of the agreements reached by the Company and the Union negotiators. Merely because the agreements were considered "tentative" does not necessarily mean that they were subject to being withdrawn at any time for any reason. The doctrines of traditional contract law are to a large extent inapplicable in the collective bargaining context. *See American Seating Co. v. NLRB*, 5 Cir., 1970, 424 F.2d 106, 108; *San Antonio Machine & Supply Corp. v. NLRB*, 5 Cir., 1966, 363 F.2d 633.

■ Finally, the Master's remarks concerning the necessity for "spade work" and his almost casual approval of Alterman's limited participation in the negotiations until mid-1974 reflect a misconception of the law concerning the obligation of the Company to engage in meaningful bargaining. Again, this error stems from his giving too much weight to the reserved right of ratification and the tentative nature of the agreements reached—the Master apparently thought that the reservation of a right of final approval justified Alterman's position that the Company's negotiators were engaging in preliminary discussions with the Union,[7] any and all agreements reached being subject to plenary review by him when the time came to put together the final product. But the law is clear that, while negotiators need not be vested with authority to enter into binding agreements, the employer must treat the negotiation sessions as something more than "a mere exchange of ideas." *Great Southern Trucking Co. v. NLRB*, 4 Cir., 1942, 127 F.2d 180, 185, cert. denied, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524. *See Manor Milling & Contracting Corp.*, 1972, 197 N.L.R.B. 1057, 1059, enforced, 3 Cir., 1973, 478 F.2d 1399; *MFA Milling Co.*, 1968, 170 N.L.R.B. 1079, 1096–97, enforced, 1972, *Local Union 676 v. NLRB*, 150 U.S.App.D.C. 117, 463 F.2d 953.

In short, the Master apparently considered determinative his evidentiary findings concerning the reservation of a right to ratify and the tentative nature of the agreements reached. He erred in not looking further. As we have observed before, "probably in few other instances is the task of judging so difficult" than determining whether a party has fulfilled its duty "to enter into discussions with an open and fair mind, and a sincere purpose to find a basis of agreement . . . . The truth is that objective standards are generally either unavailable or unavailing. And conduct done at one time judicially ascertained to manifest good faith, may, under other circumstances, be a mere pretense." *NLRB v. Herman Sausage Co.*, 5 Cir., 1960, 275 F.2d 229, 231.

### IV. Bad Faith Bargaining

■ Thus freed from the restraints of the clearly erroneous rule, we must independently evaluate the evidence to determine whether the Board has established that the respondents failed to bargain in good faith. The party urging contempt has the burden of establishing conduct in derogation of the Court's judgment by clear and convincing evidence, a standard more exacting than that normally applied in unfair

---

7. Alterman testified that the negotiators "were . . . only drafting language for consideration."

**222**

labor practice proceedings. *NLRB v. J.P. Stevens & Co.*, 5 Cir. 1976, 538 F.2d 1152, 1160; *NLRB v. Laney & Duke Storage Warehouse Co.*, 5 Cir., 1970, 424 F.2d 109, 112.

To properly evaluate the respondents' conduct in light of the applicable law, it is first necessary to examine in some detail the proposals Alterman advanced at the August 15 and November 7, 1974 bargaining sessions.[8] We are hampered somewhat in this discussion by the failure of the Master, due to his erroneous belief that the reserved right of ratification cleansed Alterman's conduct of any taint, to make specific factual findings as to what transpired at these meetings. However, we have carefully reviewed the record and believe it to support the following factual description. We therefore find no necessity to remand for further factfinding. *Cf. Davis v. United States*, 5 Cir., 1970, 422 F.2d 1139, 1142; *Mongiello Bros. Coal Corp. v. Houghtaling Properties, Inc.*, 5 Cir., 1962, 309 F.2d 925, 929.

As reflected by the February 21, 1973 status sheet, the negotiators had reached tentative agreement on the majority of non-economic items. Of the 19 items designated "O.K." in that document, Alterman's August 15 and November 7 proposals left only nine intact—Contracting Parties, Bargaining Unit, Separability and Savings, Pay Period, Federal and State Regulations, Non-discrimination, Jury Duty, Maintenance of Standards, and Hiring Practices—and most of these items were of a noncontroversial sort.[9] His proposed changes in the remaining ten articles represented in many instances notable departures from the tentative agreements. In particular, his proposals regarding Employee Examinations, Management Rights, Work Rules, Grievance and Arbitration, Work Stoppages and Lock Outs, and Stewards significantly affected the substance of the previously negotiated articles.[10]

(1) *Employee Examinations.* This article had been discussed and negotiated over several bargaining sessions. It had first come up in the March 2, 1973 session and had been discussed again on April 25, 1973. The Company negotiators advanced proposed language on May 10, 1973. Dumas objected to this proposal. He counterproposed that the Company pay the cost of all required examinations and that the article adopt the "three-doctor" principle. Under the three-doctor principle, where an employee is refused continued employment because of a negative examination report by the Company's doctor, the employee has the right to be examined at his own expense by a doctor of his own choosing. If the employee is found fit by his own doctor, the Company then has the choice either of accepting that determination or of requiring an examination by a third doctor, whose expenses are shared by the parties and whose findings are determinative. The differences between the Union and Company proposals were resolved at the February 14, 1974 meeting, essentially by incorporating the Company's proposals as to who bears the cost of particular examinations and the Union's proposals as to the three-doctor principle.

8. We cannot, of course, "sit in judgment upon the substantive terms of collective bargaining agreements." *NLRB v. American National Ins. Co.*, 1952, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027. But we are not precluded from examining the substantive proposals put forth in evaluating the parties' good faith. *See NLRB v. F. Strauss & Son, Inc.*, 5 Cir., 1976, 536 F.2d 60, 64; *NLRB v. Herman Sausage Co.*, 5 Cir., 1960, 275 F.2d 229, 231–32.

9. In addition, Alterman asserted at both the August 15 and November 7 meetings that he intended to propose further changes.

10. Alterman's proposed changes in other articles were by no means trivial. For example, in the Preamble and Existing Operating Procedures article, he proposed to eliminate language providing that dockmen, drivers, and driver's helpers would receive regular contract rates of pay during their training period. He also proposed to delete the clause which guaranteed the employment of a minimum number of hourly drivers "if the number of local drivers can be agreed to" and to substitute a clause that expressly pretermitted any guarantee of employment. In the Seniority article, he proposed to reduce from three years to two the period in which the Company would be obligated to recall laid-off employees.

On August 15, Alterman proposed to eliminate the three-doctor principle and to substitute a clause providing that the Company would be the sole judge of fitness for continued employment. His proposal retained the previous language on examination costs.

(2) *Management Rights.* The Company negotiators presented proposed language for a Management Rights article on March 3, 1973. The Union objected to the broadness of the language and agreement was reached on December 11, 1973 on language more limited in scope.

Alterman on August 15 rejected the agreed-to article and proposed a "Functions of Management" article that contained much broader language, established unilateral Company control over the size of the work force and the contracting-out of work, and reserved to the Company the right "to close down the Terminal or any part thereof or expand, reduce, alter, combine, transfer, assign or cease any job, department, operation or service" and "to otherwise generally manage the Terminal and establish terms and conditions of employment." On November 7, he proposed a "Management Perogatives" article which was evidently intended as a supplement to, and not as a replacement for, the Functions of Management article [11]. This proposal also contained broader language than that in the tentatively agreed to Management Rights article.

(3) *Work Rules.* The Company presented a proposed Work Rules article on March 9, 1973. A supplemental proposal was presented on January 18, 1974. The bulk of the January 18 bargaining session was taken up with a clause-by-clause review of the Company's proposals, with the Union making numerous objections and counterproposals. The result of the meeting was a commitment by the Company negotiators to redraft the rules. The Company presented its redraft on February 21, 1974. This redraft was discussed, modified, and eventually accepted.

On August 15, Alterman proposed to replace the February 21, 1974 language with a list of "General Instructions." This list was almost identical to the Work Rules proposal the Company had submitted on March 9, 1973.

(4) *Grievance and Arbitration.* The Company made its initial proposal for a Grievance and Arbitration article on March 3, 1973. The proposal was discussed on April 5, 1973, and agreement was reached on December 11, 1973. Certain changes were agreed to at the February 14, 1974 meeting.

On August 15, 1974 Alterman proposed to set aside the agreed-to article and to substitute either an article that reduced from ten days to two the time an employee's grievance would have to be presented to and discussed with his supervisor or an article that Alterman said he was preparing and which would replace the provision for selection of an arbitrator with a clause providing for the appointment of a six-man arbitration committee.

On November 7, 1974, Alterman presented another Grievance and Arbitration proposal. This proposal removed from the purview of the grievance procedure any matter covered by the Management Rights clause—including the subcontracting of unit work—and, perhaps more importantly, listed 19 "offenses" the commission of which "can be cause for immediate discharge and will not be subject to arbitration." Among the offenses listed were "horseplay of any form," "refusal to obey a proper order or any insubordinate action toward a supervisor," "failure to comply with safety rules," and "failure to comply with Company work rules." There was no similar provision in the tentatively agreed-to Grievance and Arbitration clause. Finally, Alterman's November 7 proposal restricted the arbitrator's authority and explicitly denied to him "jurisdiction to pass upon the severity of the penalty imposed by Management." The February 14, 1974 article had recognized the authority of the arbitrator to modify the penalty imposed.

11. *See* note 14, *infra.*

(5) *Work Stoppages and Lock Outs.* The Company negotiators made a written proposal on Work Stoppages and Lock Outs on March 3, 1973. The proposal was discussed extensively on April 5, 1973, the parties agreeing that they should select a permanent arbitrator to arbitrate disputes arising under the article. On April 25, 1973, the negotiators agreed to name Professor James Vadakin as the permanent arbitrator. Further aspects of the article were discussed on January 11 and February 14, 1974. The agreement that resulted prohibited strikes and lockouts, provided that it would not be a violation of the agreement for employees to refuse to cross primary picket lines, whether at Alterman's or some other employer's premises, and provided further that the Union would not sanction, encourage, or condone work stoppages. Either party could invoke the arbitration procedure, and James Vadakin was designated the permanent arbitrator.

At the August 15 meeting, Alterman proposed several major changes in the Work Stoppages and Lock Outs article. He proposed to eliminate the clause recognizing the right of employees to respect primary picket lines and to substitute a clause that would expressly make it a violation of the agreement and cause for discharge for an employee to honor a picket line. Second, he proposed to delete in its entirety the provision for arbitration of disputes under the article, a provision that had been included in every Company proposal to date. Finally, he proposed a Struck Goods section. This section in effect made it a breach of contract and cause for discharge for an employee to refuse to perform work on any goods or equipment transported, handled, or used by any employer involved in a labor dispute. Disputes arising under the Struck Goods section were specifically excluded from the grievance procedure.

Alterman presented another proposal on Work Stoppages and Lock Outs at the No-

vember 7 meeting. This proposal retained Alterman's August 15 modifications and also deleted the prohibition of Company lockouts.

(6) *Stewards.* The Union's initial Stewards proposal was discussed by the negotiators at the March 3, 1973 meeting. The Company advanced a counterproposal on March 8. Further discussion was had at the July 31, 1973 bargaining session, perhaps the chief stumbling block to agreement being the number of stewards the Union would be allowed to designate. Agreement on the article was reached on December 11, 1973. The agreed-to provision granted the Union the right to designate two stewards, outlined their responsibilities, and provided that they "shall be permitted reasonable time to investigate, present and process grievances . . . without loss of time or pay during their regular working hours."

At the August 15 meeting, Alterman stated that he completely objected to the Stewards article. He presented a substitute proposal at the November 7 session. This proposal reduced the number of stewards from two to one, required the steward to obtain prior approval before undertaking Union business, and provided that "time consumed by stewards handling union matters exceeding fifteen (15) minutes shall not be subject to compensation by the Employer." Alterman's November 7 proposal also deleted the clause granting stewards the authority to collect union dues. Finally, Alterman's proposed article granted the steward "superseniority"—automatic elevation to highest seniority in any job classification in case of layoff—despite Dumas's consistently maintained opposition to such a provision.

In addition to the changes Alterman proposed in the articles previously bargained, he presented several proposals for new articles. The most significant of these proposals were those regarding Territorial Jurisdiction and More Favorable Agreement.[12]

12. Alterman also presented proposals on two other entirely new topics: Student Apprentice and Probationary Period. The Student Apprentice article permitted the Company to hire stu-

dents on vacation from school "when there is a need and they possess the capacity to do the work assigned" and expressly stated that student employees "shall not be covered under nor

The Territorial Jurisdiction proposal provided that the jurisdiction of the Union would be limited to the Miami terminal and that any new terminal "and such territory as may be designated by the Company to operate the said new terminal shall be excluded from the jurisdiction of the Union." Though the precise intent of this clause is unclear, a memorandum from Sidney Alterman to Roy Pfeiffer dated June 13, 1974 indicates that Alterman thought it a waiver by the Union "of any right to organize other employees of the company." [13] The More Favorable Agreement article provided that should the Union negotiate a contract with another motor carrier that contained terms more favorable to the carrier than were similar terms in the contract with the Company, the Company would have the right to amend the agreement to include the more favorable terms.[14]

The point of this rather long discussion of Alterman's August 15 and November 7 proposals is not to condemn the substantive positions that Alterman took. Indeed, nearly all of the proposals, with the possible exception of his Territorial Jurisdiction proposal,[15] incorporate positions that could legitimately have been maintained by the Company. The point is, rather, that the proposals represent a retrenchment from positions previously maintained and a rejec-

tion of most of the significant compromises reached during the nearly two years of previous bargaining. In an effort to avoid the natural inferences arising from this fact, the respondents seek to explain and justify Alterman's conduct by a three-pronged argument. Not surprisingly, the argument tracks in large part the Master's reasoning: [16] (i) Alterman lawfully reserved a right of ratification at the first meeting; (ii) the proposals made and agreements reached were intended to be tentative only; and (iii) Alterman's withdrawal from tentative agreements was supported by "good cause" because he gave legitimate reasons for the changes he was proposing.

We find these justifications inadequate and unpersuasive. As we observed above, we do not dispute that an employer may lawfully reserve a right of ratification. Nor do we think that agreements reached during the course of bargaining are necessarily final and binding on both parties. The sight of the forest can be lost among the trees as individual articles are separately bargained during the course of protracted negotiations, and the reopening of negotiations on individual articles tentatively agreed-to is entirely legitimate and desirable when later developments disclose a problem that was previously unforeseen or the improvidence of an earlier concession.

---

subject to the terms and conditions of this agreement." The Probationary Period article provided that a new employee would be on 90-day probation, during which time he could be discharged without recourse to the grievance procedure.

13. Alterman testified at the hearing, however, that he intended the clause only to prevent the automatic extension of the contract to cover employees at any newly established terminals.

14. The respondents also introduced into evidence a document that Alterman testified was a draft contract intended for presentation to the Union. This draft was allegedly completed sometime between December 9 and 12, 1974, but was never given to the Union. The draft contains the November 7 Grievance and Arbitration proposal; the August 15 Functions of Management proposal; the November 7 Management Prerogatives proposal; the August 15 Seniority proposal; the November 7 Stewards proposal; the August 15 Employee Examinations proposal; the August 15 More Favorable

Agreement proposal; the November 7 Work Stoppages and Lock Outs proposal; the August 15 Student Apprentice proposal; and the August 15 Probationary Period proposal. The Meals article agreed to by the negotiators on January 10, 1974 was revised. Absent from the contract draft was the Discharge article that had been tentatively agreed to on February 14, 1974. This article had required a warning notice prior to taking disciplinary action, except with respect to certain specified infractions, and had set out rights of appeal from disciplinary action. The agreed-to Maintenance of Standards article was also nowhere present.

15. See *Continental Insurance Co. v. NLRB,* 2 Cir., 1974, 495 F.2d 44, 49 (demand that union agree not to organize other employees of the company is "wholly unreasonable"). *But see* note 13, *supra.*

16. See Section III, *supra.*

The reservation of a right of ratification can perform a similar function, as it gives the employer one last chance to see how individual articles hang together and to evaluate the contract as a whole. *See Capital Transit Co.,* 1953, 106 N.L.R.B. 169.

But there comes a point, however hard it may be to articulate, when an employer's action in reopening tentative agreements gives rise to an inference that he harbors an intent to string out negotiations and avoid reaching an agreement. *See NLRB v. F. Strauss & Son, Inc.,* 5 Cir., 1976, 536 F.2d 60, 64; *NLRB v. Big Three Industries, Inc.,* 5 Cir., 1974, 497 F.2d 43, 47; *NLRB v. A. W. Thompson, Inc.,* 5 Cir., 1971, 449 F.2d 1333, 1335, *cert. denied,* 1972, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795; *American Seating Co. v. NLRB,* 5 Cir., 1970, 424 F.2d 106, 108; *San Antonio Machine & Supply Corp. v. NLRB,* 5 Cir., 1966, 363 F.2d 633, 636–37; *NLRB v. International Furniture Co.,* 5 Cir., 1954, 212 F.2d 431, 433. This is true even when the employer justifies his conduct as the exercise of a reserved right of ratification, for he may be using that device to camouflage his true intention. *See Great Southern Trucking Co. v. NLRB,* 4 Cir., 1942, 127 F.2d 180, *cert. denied,* 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524; *Borg Compressed Steel Corp.,* 1967, 165 N.L.R.B. 394.

The respondents' bargaining table conduct in this case clearly mandates an inference of bad faith bargaining. Alterman's conduct went far beyond the adjustment of individual articles in light of the whole and was in effect a repudiation of all or most of what had gone before. Some of his August 15 and November 7 proposals were harsher than those *originally* put forth by Company

negotiators—for example, his proposals on Work Stoppages and Lock Outs, on Management Rights, and on Grievance and Arbitration. Other of his proposals rejected compromises that had been fully and completely discussed and negotiated over several bargaining sessions and proposed in their stead articles substantially similar to those originally offered by the Company—for example, his proposals on Employee Examinations, on Work Rules, and on Stewards. Significantly, those articles on which he proposed the most far-reaching changes were among those that had been the subject of the most controversy and whose negotiation had taken up the lion's share of the bargaining sessions. Moreover, Alterman was quick to negate any implication that he approved of those articles left untouched or that he was finished with those articles on which he had proposed changes.[17]

It simply will not do to reply, as do the respondents, that the negotiators were engaged in "spade work" and were drafting "language for consideration." Emphasis is placed upon the necessity of a tailor-made .contract due to the unique nature of the Company's business. Because of this circumstance, it is argued, much in the way of preliminary negotiations were required before the parties could get down to the brass tacks of putting together a final agreement. However, even assuming that the uniqueness of the Company's operations was such as to affect most of the noneconomic articles—an assumption whose validity we doubt, especially as respects such articles as Grievance and Arbitration and Employee Examinations—the argument is unconvincing. The negotiators an employer sends to bargaining sessions must be able to

---

17. This case is not like *NLRB v. Randle-Eastern Ambulance Service, Inc.,* 5 Cir., 1978, 584 F.2d 720, *M. R. & R. Trucking Co. v. NLRB,* 5 Cir., 1970, 434 F.2d 689, or *NLRB v. Minute Maid Corp.,* 5 Cir., 1970, 283 F.2d 705, cases in which the employer's conduct was amply justified by intervening events between the time the initial proposals or tentative agreements were made and the time they were withdrawn. We emphasized in *Randle-Eastern,* for example, that the employer's actions "must be viewed in the context of the negotiations in which they

arose," and held that in the circumstances present there—the occurrence of a strike, the employer's consequent loss of a contract that accounted for some 60% of its business, and the union's withdrawal from some of its prior commitments—the employer's withdrawal of previous concessions "was a natural response to the economic pressures it was experiencing." 584 F.2d at 726. In contrast, the only intervening event of any significance in this case was Alterman's entrance into the negotiations.

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ 227

speak for the employer if meaningful bargaining is to take place.[18] If Alterman was the only person with the authority to commit the Company and the only person with sufficient knowledge of the Company's business and unique needs to formulate a Company position, then it was incumbent upon him to at least brief his negotiators respecting his position and maintain some supervision over the proposals made and agreements reached. He did not do so. He did not review the proposals of the Company negotiators before they were made, he did not review the agreements reached until sometime in April of 1974, and he did not let his negotiators know of his displeasure with the draft articles until late June of 1974. Indeed, Roy Pfeiffer, the Company's chief negotiator, testified that he had not even seen Alterman's proposed changes prior to the August 15 meeting. Alterman's approach virtually ensured the breakdown of negotiations when he finally made his third act reappearance at the bargaining table.

The respondents argue that to require more of Alterman than eventual review of the near-complete noneconomic package is unrealistic and would have done more to inhibit than to promote negotiations. As stated in their brief,

> The participation of Sidney Alterman, who had little, if any, experience in negotiating a labor agreement was not likely to shorten measurably the [negotiation] process, but it would detract significantly from his ability to devote the time and effort needed to operate the other aspects

of his business which also required his attention.

The respondents' argument misses the mark. The issue is not whether Alterman should have been handling the negotiations himself, but whether he maintained sufficient contact with his representatives that they could represent the Company intelligently and adequately. Furthermore, the respondents' "busy man" argument has been rejected again and again in analogous circumstances. *See, e. g., B. F. Diamond Construction Co.,* 1967, 163 N.L.R.B. 161, 175, enf'd, 5 Cir., 1969, 410 F.2d 462, cert. denied, 396 U.S. 835, 90 S.Ct. 94, 24 L.Ed.2d 86; *A. H. Belo Corp. v. NLRB,* 5 Cir., 1969, 411 F.2d 959, 968, cert. denied, 1970, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498.

⬛⬛ The respondents' reliance on the fact that Alterman advanced reasons for his proposed changes also does not avail them. Rather than going into the specifics of Alterman's justifications, it is enough to observe that those objections did not develop suddenly in August of 1974. The situation is similar to that presented in *NLRB v. Industrial Wire Products,* 9 Cir., 1972, 455 F.2d 673, 679. The circumstances there were somewhat more egregious, in that the employer refused to accept agreements which had been negotiated in his presence and to which he expressed no reservations. But the principle is the same: if the employer has an objection to a Union proposal or a tentative agreement, it is generally obligated to express that objection so that meaningful bargaining can proceed. Whether the objection is withheld inten-

18. This is not to say, of course, that the employer must provide a representative with authority to enter binding agreements. *See Lloyd A. Fry Roofing Corp. v. NLRB,* 9 Cir., 1954, 216 F.2d 273, modified on other grounds, 1955, 220 F.2d 432, a case on which respondents rely:

> The Board urges in the instant case the contention that the Company's action amounted to no more than negotiation by correspondence since Bahrs had so little authority that he was merely a messenger boy or mailman. We are not so persuaded. Union representatives were at liberty to discuss with Bahrs any and all proposals and counter-proposals and thus secure clarification of the issues, an important element in reaching

agreement. Bahrs could, and did, make recommendations to the Company, and thereby conveyed to it an appraisal of the situation and the Union's demands.

> No doubt the delegation of more authority to Bahrs would have expedited the negotiations. However, the lack of authority which the bargaining representative possesses in negotiating labor agreements should not be held to be *per se* a violation of § 8(a)(5).

In *Fry Roofing,* however, in contrast to the present case, the negotiators were at least conveying the Company's position to the Union and relaying back the Union's response to those with authority to make decisions.

tionally, as in *Industrial Wire Products,* or because the negotiators are in the dark about the intentions of their principal, the employer's conduct is equally inconsistent with the requirements of good faith bargaining.

In sum, Sidney Alterman's approach to collective bargaining was to sit idly by while his representatives negotiated with the Union for nearly two years. Under the guise of exercising a reserved right of ratification, he then rejected in large part the results of those negotiations. For all the real difference it would have made, the negotiators could just as well have been debating the existence of a God, the likelihood of the Dolphins repeating as world champions, or the optimal shape of the bargaining table. Alterman's reservation of a right to ratify and his failure to attend to the course of negotiations simply will not justify this perversion of the bargaining process. The inference of an intent to string out negotiations and avoid reaching an agreement is well-nigh inescapable. We hold that the evidence clearly and convincingly demonstrates the respondents' failure to bargain in good faith.

## V. Withdrawal Of Recognition

As stated above, the Company withdrew recognition from and refused to bargain further with the Union following receipt of a petition signed by 80 to 90% of the employees stating that they no longer desired representation by the Union. In the absence of employer unfair labor practices, a disaffection petition signed by a majority of unit employees usually constitutes sufficient objective evidence to support a reasonable doubt of the Union's continued majority status. If the certification year has run, see *Brooks v. NLRB,* 1954, 348 U.S. 96, 103–04, 75 S.Ct. 176, 99 L.Ed. 125, the employer may then lawfully refuse to bargain further with the Union. *See, e. g., NLRB v. Dell,* 5 Cir., 1962, 309 F.2d 867. Here, however, the Union's possible loss of majority status is attributable to the respondents' failure to bargain in good faith, and the Company may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own contumacious conduct. *See NLRB v. Warren Co.,* 1955, 350 U.S. 107, 112, 76 S.Ct. 185, 100 L.Ed. 96; *NLRB v. Schill Steel Products, Inc.,* 5 Cir., 1973, 480 F.2d 586, 590–91; *NLRB v. A. W. Thompson, Inc.,* 5 Cir., 1971, 449 F.2d 1333, 1337, *cert. denied,* 1972, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795; *NLRB v. Frick Co.,* 3 Cir., 1970, 423 F.2d 1327, 1333.

## VI. The Remedy

In response to a question at oral argument concerning the measures sought in order to remedy the respondents' contumacious conduct, the Board has by letter referred us to its proposed purgation order submitted to the Master. The respondents have replied that they cannot address the remedy issues in the absence of findings as to the misconduct the purgation order should be designed to remedy. The respondents have a good point. *See NLRB v. J. P. Stevens & Co.,* 5 Cir., 1976, 538 F.2d 1152, 1166; *NLRB v. Schill Steel Products, Inc.,* 5 Cir., 1973, 480 F.2d 586, 596. Accordingly, we direct the Board to file a suggested purgation order and memorandum in support thereof with this Court within 40 days from the date of this opinion. Respondents are given an additional 40 days to file objections and recommendations and accompanying memorandum. Following this the Court by supplemental opinion will prescribe the remedy.

Respondents are adjudged guilty of civil contempt of this court.

PETITION GRANTED.